866 F.2d 752
 1990 A.M.C. 447, 8 UCC Rep.Serv.2d 659
 EMPLOYERS INSURANCE OF WAUSAU as Representative of Those
Certain Underwriters Subscribing to Certificate
no. 14880 and Certificate no. 14482,
Plaintiff- Appellee,
v.
SUWANNEE RIVER SPA LINES, INC., Suwannee River Chartering,
Inc., Permian Trading Corporation, Occidental Export, Inc.,
Occidental Chemical Agricultural Products, Inc., and
Occidental Petroleum Corp., Plaintiffs-Appellants,
v.
AVONDALE SHIPYARDS, INC., et al., Defendants,
J.J. Henry Co., Inc., and Victoria Machine Works, Inc.,
Defendants-Appellees.
OCCIDENTAL PETROLEUM CORP., et al., Plaintiffs-Appellants,
v.
AVONDALE SHIPYARDS, INC., et al., Defendants,
Victoria Machine Works, Inc., Defendant-Appellee.
OCCIDENTAL PETROLEUM CORP., et al., Plaintiffs-Appellants,
v.
AVONDALE SHIPYARDS, INC., et al., Defendants,
Victoria Machine Works, Inc., Defendant-Appellee.
EMPLOYERS INSURANCE OF WAUSAU as Representative of those
Certain Underwriters Subscribing to Certificate
no. 14880 and Certificate no. 14482,
Plaintiff- Appellee,
Suwanne River Spa Lines, Inc., et al., Plaintiffs-Appellees,
v.
AVONDALE SHIPYARDS, INC., et al., Defendants-Appellants.
EMPLOYERS INSURANCE OF WAUSAU as Representative of those
Certain Underwriters Subscribing to Certificate
no. 14880 and Certificate no. 14482, et
al., Plaintiffs-Appellees,
v.
AVONDALE SHIPYARDS, INC. and Ogden Corporation, Defendants-Appellants.
 Nos. 86-3218, 86-3473 and 87-3549.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 13, 1989.
Rehearing and Rehearing En Banc Denied March 20, 1989.
 
 Geoffrey J. Ginos, Herbert M. Lord, Burlingham, Underwood & Lord, New York City, John J. Weigel, Stewart E. Niles, Jr., New Orleans, La., for Ogden and Avondale.
 Norman C. Sullivan, Jr., Gelpi, Sullivan, Carroll & Laborde, New Orleans, La., Terence Gargan, New York City, for Hvida, et al.
 James B. Kemp, Jr., George R. Wentz, Jr., George B. Hall, Jr., New Orleans, La., for appellees.
 John J. Weigel, Stewart E. Niles, Jr., Madeleine Fischer, Edward H. Bergin, George R. Alvey, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Avondale.
 Charles E. Lugenbuhl, Nathan P. Horner, Lugenbuhl, Wheaton, Peck & Rankin, New Orleans, La., for Employers Ins. and Am. Underwriters.
 Phillip A. Wittmann, Denise M. Pilie, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., Jesse Climenko, John B. Grant, Jr., New York City, for J.J. Henry Co., Inc.
 James B. Kemp, Jr., Margot Mazeau, New Orleans, La., for Certain Underwriters at Lloyds.
 Paul A. Nalty, Joel L. Borrello, Michael D. Carbo, New Orleans, La., for Victoria Machine Works.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before KING and JOHNSON, Circuit Judges, and BOYLE, District Judge.*
 KING, Circuit Judge:
 
 I.
 
 1
 This lawsuit arises from the ill-fated voyage of the Oxy Producer, a catamaran integrated tug barge. While en route to the Soviet Union with a cargo of chemicals, the linkage system that held the tug and barge together as a single unit failed. Efforts to repair the vessel while at sea proved fruitless and the tug sank in heavy weather off the Azores. This lawsuit ensued, replete with claims and cross-claims against and between the owner and insurers of the vessel and various parties who played a role in its construction.
 
 
 2
 On appeal, we affirm the district court's holding that the vessel was improperly mated and unseaworthy on delivery and that this was the sole cause of the damage to the vessel and the loss of the tug. We hold, however, that the economic loss rule adopted in the East River case precludes recovery in maritime tort for purely economic loss stemming from the negligent performance of a contract for professional services where those services are rendered as part of the construction of a vessel. The plaintiffs are therefore limited to their contractual remedies against the contract supervisor. While the maritime tort claims must consequently be dismissed, we retain pendent jurisdiction over the remaining claims.
 
 
 3
 We hold further that the contract supervisor's acceptance of the vessel in its improperly mated condition was not binding on the purchaser, and that the shipbuilder is therefore fully liable to the owner for breach of contract. We find, however, that the Construction Contract effectively limits the shipbuilder's liability to the cost of repairing or replacing deficiencies in the contract work.
 
 
 4
 Finally, we hold that the district court improperly dismissed two parties from the suit following its conclusion that they were not liable for damage to the Oxy Producer. While we affirm that finding, we hold that dismissal was premature and remand for specific findings regarding the liability of all defendants for the damage to the Oxy Producer's two sister ships.
 
 A. The Cast
 1. Plaintiffs
 
 5
 Plaintiffs below were Suwannee River Lines, Inc., Suwannee River SPA Lines, Inc., and Suwannee River Phosphate Lines, Inc. (collectively, the "lines"), the bareboat charterers of, respectively, the Oxy Trader, the Oxy Producer, and the Oxy Grower (collectively, the "ships"); Suwannee River Chartering, Inc. ("Chartering"), the time-charterer of the ships; Occidental Export, Inc. ("Export"), the seller of certain chemicals transported by the ships; and Occidental Petroleum Corp. ("Occidental"), the parent corporation of all of the preceding plaintiffs. Additionally, the American underwriters and certain underwriters at Lloyds assert subrogated claims.
 
 
 6
 Lines, Chartering, Export, Chemical, and Occidental are referred to collectively as "Occidental" or as the "Oxy plaintiffs." Because this lawsuit focuses primarily on the sinking of the Oxy Producer, it will be referred to most often, and the Oxy Grower and Oxy Trader will be referred to as the "sister ships."
 
 2. Defendants
 
 7
 The defendants are J.J. Henry Co. ("Henry"), a naval architectural firm; Avondale Shipyards, Inc. ("Avondale"); Ogden Corp. ("Ogden"), guarantor and former parent of Avondale; Victoria Machine Works, Inc. ("Victoria"), the manufacturer and supplier of certain component parts for the ships; and Seabulk Transmarine I, Inc., Seabulk Transmarine II, Inc., Hvide Marine International, Inc., and Hvide Shipping, Inc. (collectively, "Hvide"), supervisors of the design and construction of the vessel. Hvide also provided the crew of the Oxy Producer and thus appears in this law suit in two roles.
 
 B. The Claims
 
 8
 In the early 1970's, Occidental entered an agreement to manufacture, sell, and transport superphosphoric acid ("SPA") to the Soviet Union. Shortly thereafter, Occidental arranged for the construction of three catamaran integrated tugbarges ("catug ITBs") to transport the SPA to the Soviet Union.[1] The unique feature of a catug ITB is the interconnection system between the tug and barge units consisting of bumper pads, link arms, and greenheart-bearing surfaces which are designed to hold the tug and barge together as a single rigidly connected unit.
 
 
 9
 Defendant Hvide holds a patent on the catug design and was retained, because of its expertise with this type of vessel, to supervise the design and construction of the vessels for Occidental ("Supervision Agreement"). Hvide contracted in turn with J.J. Henry to prepare the plans and specifications for the vessels ("Henry Agreement"). Hvide assigned the Henry Agreement to Occidental. Occidental then engaged Avondale to construct the vessel ("Construction Contract"). Avondale entered into a subcontract ("Purchase Order") with Victoria to manufacture the bumper pads for the catug's interconnection system.
 
 
 10
 The vessels were completed and delivered between March and September of 1981. The Oxy Producer was delivered on June 9, 1981 and made one uneventful round-trip voyage between the United States and the Soviet Union. Its second voyage, however, was disastrous. The Oxy Producer embarked from Jacksonville, Florida on September 5, 1981. On the evening of September 11, the Oxy Producer encountered weather conditions more severe than any it had previously encountered. During the early morning hours of September 12, a crewmember on watch first noticed relative movement between the tug and the barge. The movement increased and the crew discovered, on examination, that parts of the linkage system were damaged. The crew attempted to make temporary repairs but the movement worsened and the linkage system deteriorated further. The captain of the Oxy Producer, Captain Kanellos, decided to divert the vessel to the Azores in order to make repairs. The vessel arrived at the Port of Ponta Delgada in the Azores on September 14 but was denied entry into the harbor. While the crew awaited the result of further efforts to obtain permission to enter the harbor, they effected further repairs to the ship which remained at anchor a half mile off the breakwater at Ponta Delgada. The weather forecast on September 18 was for heavy weather on September 20 due to tropical storm Harvey, passing to the southwest of the Azores. On the night of the 19th, Captain Kanellos evaluated possible responses to the predicted change in weather. Afraid of dragging anchor and spilling his hazardous cargo if the ship remained anchored near the breakwater, the captain decided early on the morning of the 20th to weigh anchor and maneuver the vessel away from the breakwater. Before the vessel could proceed, however, a second storm, coming from the north, passed over the area, creating confused seas and causing even greater movement between the tug and the barge. The movement of the barge tongue against the hulls of the tug ultimately opened large holes in the hulls, causing the tug to sink.
 
 
 11
 Following the sinking of the Oxy Producer, the Coast Guard revoked the inspection certificates on the Oxy Producer's two sister ships--the Oxy Trader and the Oxy Grower. The linkage systems on each of the sister ships were subsequently repaired and upgraded.
 
 
 12
 Occidental then brought this lawsuit to recover damages stemming from the loss of the Oxy Producer and from the recission of the certificates of inspection for the two sister ships.[2] The Oxy plaintiffs asserted that the sinking of the Oxy Producer's tug was due to defendants' breaches of their contractual duties and to negligence in the performance of their contracts and that defendants are similarly responsible for the repairs to the sister ships. The claims against the various defendants were as follows:
 
 
 13
 Henry: The Oxy plaintiffs asserted below that Henry breached its warranty that the plans and specifications were seaworthy. The plaintiffs also alleged that Henry was negligent in performing its contract, particularly in failing to consult the patent, to conduct model tests, or to follow up on defects noted in its plan review.
 
 
 14
 Avondale: Plaintiffs asserted that Avondale breached its contract and its warranty and specifically that, when delivered, the Oxy Producer was not properly mated in accordance with the plans and specifications, that the link arms and bumper pads were defective, and that the vessel consequently was not seaworthy. The plaintiffs also alleged that Avondale was negligent in performing its contract and in delivering the vessel in an unseaworthy condition.
 
 
 15
 Avondale responded that it could not be held liable for any deficiency in the mating of the vessel because Hvide was Occidental's agent and authorized the mating procedure and accepted delivery of the vessel with full knowledge of the measurements of the fit which Occidental now claims were not in accordance with the plans and specifications. Avondale further asserted that the loss of the tug was due to the crew's negligence in failing to tighten the linkage system after the first voyage, and not to an initially improper mating. Avondale also claimed that once the problem was discovered, the tug would not have been lost if the captain had been sufficiently diligent in his efforts to secure entry into the harbor.
 
 
 16
 Victoria: Plaintiffs claimed that they were third party beneficiaries of the Victoria Purchase Order and that Victoria breached its contract and its warranty in two respects: first, the bumper pads were not sufficient to restrict relative movement between the tug and the barge, and second, the bumper pads were not vulcanized as required by the Purchase Order.
 
 
 17
 Hvide: Plaintiffs asserted that Hvide breached its contract and its warranty that the catug design was seaworthy and had been fully integrated into the plans and specifications. Plaintiffs also claimed that Hvide was grossly negligent in performing its contractual duties.
 
 C. The District Court Opinion
 
 18
 At the conclusion of a three and one half month bench trial, the district court concluded that the sole cause of the sinking of the Oxy Producer was that the vessel had not been properly mated and was therefore unseaworthy on delivery. The court found that Avondale had breached its contract and its express warranty of seaworthiness and had been negligent in the performance of its contract, but found that the Construction Contract effectively disclaimed tort liability. The court also found that Hvide had breached its Supervision Agreement and its warranty that the plans were seaworthy and that Hvide had furthermore been negligent in supervising the mating of the vessel. The court found that the Supervision Agreement did not limit Hvide's liability in tort, so that Hvide could be liable for damages beyond the $5 million limitation provided in the contract.
 
 
 19
 The district court found that the bumper pads and link arms did not cause or contribute to causing any of the damage to the Oxy Producer but were instead casualties themselves of the improper fitting. Because Victoria and Henry were not responsible in any way for the poorly mated condition in which the vessel was delivered, they were dismissed from the case.
 
 
 20
 The proceedings below were bifurcated and the district court has not yet addressed the issue of damages.
 
 D. The Appeal
 1. Claims on Appeal
 
 21
 The Oxy plaintiffs appeal from the dismissal of Victoria and Henry. Hvide asserts on appeal that in light of the Supreme Court's decision in East River, the negligence claims against Hvide are not cognizable in maritime tort. Hvide also claims that the district court's finding that the improper mating of the vessel was the sole cause of its sinking is not supported by a preponderance of the evidence. Hvide argues further that even if the negligence claims are cognizable in maritime tort, the district court erred in holding that the limitation of liability contained in the Supervision Agreement did not apply to negligence claims as well as to contract claims. Hvide also asserts that the district court erred in imposing joint and several liability.
 
 
 22
 Going one step further than Hvide, Avondale urges that East River so clearly bars plaintiffs' negligence claims that the federal courts lack admiralty jurisdiction over this case. Avondale also challenges the dismissal of Henry, arguing that the evidence supports a finding that Henry's design of the linkage system was defective. Avondale further asserts that even if the vessel was improperly mated, the district court erred in finding that Hvide's acceptance of the vessel was not binding on Occidental. Avondale also contests the district court's finding that Avondale failed to prove that negligence of the vessel's captain or crew was an intervening or contributory cause in the damage to the vessel or in the loss of the tug. Finally, Avondale contends that even if it is liable for the improper mating of the vessel, the district court erred in concluding that Avondale's liability for breach of the warranty of seaworthiness was not limited by the guarantee deficiency clause of the Construction Contract. Avondale too contests the imposition of joint and several liability.
 
 
 23
 These claims comprise seven broad issues which we will address in turn: (1) the effect of the East River decision on this case, (2) whether the district court erred in finding that Avondale and Hvide breached their contracts by failing to deliver a properly mated and seaworthy vessel, (3) whether Hvide's acceptance of the fitting was binding on Occidental, (4) whether the district court erred in concluding that the Construction Contract created an express warranty of seaworthiness independent of the contract's limitations of remedies and liability, (5) whether the district court erred in holding that the Supervision Contract did not limit Hvide's liability in negligence, (6) whether the district court erred in holding Hvide and Avondale jointly and severally liable, and (7) whether the district court erred in dismissing Henry and Victoria from the suit.
 
 2. Standard of Review
 
 24
 The district court's findings of fact may not be set aside on appeal unless they are clearly erroneous. Fed.R.Civ.Proc. 52(a). A finding of fact is clearly erroneous only if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). The district court's conclusions of law, however, are freely reviewable on appeal. Inwood Labs v. Ives Labs, 456 U.S. 844, 855 n. 15, 102 S.Ct. 2182, 2189 n. 15, 72 L.Ed.2d 606 (1982).
 
 II.
 A. The Effect of the East River Decision
 1. Admiralty Jurisdiction
 
 25
 Defendants argue that in light of the Supreme Court's decision in East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), the federal courts have no admiralty jurisdiction over this case. In East River, the Supreme Court adopted the established rule of the Courts of Appeal that concepts of products liability, grounded in both negligence and strict liability, are a part of general maritime law. Id. at 865, 106 S.Ct. at 2299. The Court held, however, "that a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." Id. at 871, 106 S.Ct. at 2302. "Thus, whether stated in negligence or strict liability, no products-liability claim lies in admiralty when the only injury claimed is economic loss." Id. at 876, 106 S.Ct. at 2304.
 
 
 26
 The defendants contend that because the plaintiffs' negligence claims, like those of the East River plaintiffs, allege only economic loss, those claims do not sound in maritime tort and therefore do not provide a basis for admiralty jurisdiction.[3]
 
 
 27
 The plaintiffs, however, note correctly that East River 's holding has limited implications for the existence of admiralty jurisdiction. Whether a tort is maritime in nature, and therefore within the admiralty jurisdiction of the federal courts, turns on the application of the "situs" and "nexus" tests set forth in Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). If those requirements are met, the court has jurisdiction. Whether the plaintiff may recover for those torts is not a question of admiralty jurisdiction but of substantive maritime law. In East River itself, the Supreme Court found that under the "locality" test the plaintiff's tort claims were within the admiralty jurisdiction.[4] Applying substantive maritime law, the Court then affirmed the granting of summary judgment in favor of defendants based on its conclusion that the negligence claims were not cognizable in maritime tort.
 
 
 28
 Although defendants argue here that plaintiffs have failed to state a claim on which relief can be granted, the Supreme Court made clear in Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), that whether the court lacks subject matter jurisdiction and whether the plaintiff fails to state a claim on which relief can be granted are distinct questions:
 
 
 29
 Jurisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which [the plaintiff] could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.
 
 
 30
 Id. at 682, 66 S.Ct. at 776. Bell recognized two exceptions to this rule. A suit may be dismissed for want of jurisdiction when (1) the allegations are clearly concocted for the sole purpose of obtaining federal jurisdiction, or (2) the claims are "wholly insubstantial and frivolous." Id.
 
 
 31
 Thus, the federal courts would lack subject matter jurisdiction over this suit only if the plaintiffs' tort claims are so clearly barred by the East River holding that they fall within one of the Bell exceptions. We do not think that the plaintiffs' negligence claims are "so patently without merit" as to deprive the federal courts of subject matter jurisdiction.[5] Id. at 683, 66 S.Ct. at 776.
 
 
 32
 In East River, the Court expressly declined to decide "whether a tort cause of action can ever be stated in admiralty when the only damages sought are economic." 476 U.S. at 871 n. 6, 106 S.Ct. at 2302 n. 6. The East River decision thus stopped short of holding that a tort claim for purely economic loss would never be cognizable in maritime tort. Therefore, a maritime tort claim alleging purely economic loss should not be dismissed for want of subject matter jurisdiction where the requirements for admiralty jurisdiction are otherwise met if the facts of the case support a theory of recovery not clearly barred by East River or by other controlling authority.
 
 
 33
 In admiralty, as in other areas of subject matter jurisdiction, we have held that if the issues necessary to decide the question of subject matter jurisdiction are intertwined with the merits, the court should assume jurisdiction and proceed to the merits of the claim unless the maritime basis for the claim is "immaterial or is wholly insubstantial."[6] See Parker v. Gulf Fisheries, Inc., 803 F.2d 828, 829 (5th Cir.1986); 14 Wright, Miller & Cooper Federal Practice & Procedure Sec. 3676 (Supp.1988) (citing Parker ).
 
 
 34
 In the instant case, we find that the plaintiffs' claim that Hvide was negligent in performing its obligations under the Supervision Agreement are not so clearly precluded by East River as to deprive the federal courts of admiralty jurisdiction.[7] The district court held on remand that the claim against Hvide was distinguishable from the claims in East River because the Oxy plaintiffs alleged negligence in the performance of a contract for professional services. Defendants have countered that one of the claims in East River was similarly for negligent supervision--of the installation of a component part of the vessel. We note, however, that the economic loss rule adopted in East River applies specifically to claims against manufacturers and that the supervisor and the manufacturer in East River were one and the same.[8] The East River decision does not address whether the economic loss rule in maritime tort applies to contracts for professional services[9] where the provider of the services is a party other than the manufacturer itself.[10]
 
 
 35
 We therefore will not dismiss Occidental's negligence claims against Hvide for lack of subject matter jurisdiction. Rather, we hold that this case falls within the admiralty jurisdiction and will decide, on the merits, whether the plaintiffs' negligence claims are cognizable in maritime tort following the East River decision.
 
 
 36
 2. Are Plaintiffs' Negligence Claims Cognizable in Maritime Tort?
 
 
 37
 While we agree with the district court's characterization of the Supervision Contract as one for the provision of professional services, we do not agree that this answers the question whether plaintiffs' negligence claims are cognizable in maritime tort.[11] Rather, this case raises an issue of first impression: Does the East River economic loss rule apply to contracts for professional services, rendered in connection with the manufacture or construction of a product, by a party other than the builder or manufacturer?[12] In order to determine whether East River 's rationale should be extended to this context, we must review carefully the Court's reasoning and the possible arguments against limiting plaintiffs to their contractual remedies.
 
 
 38
 In deciding to limit the scope of products liability in the maritime tort context, the Supreme Court comprehensively reviewed the origins and purposes of the doctrine and its relationship to contract law. The Court noted that "[p]roducts liability grew out of a public policy judgment that people need more protection from dangerous products than is afforded by the law of warranty." 476 U.S. at 866, 106 S.Ct. at 2299. Expressing concern, however, "that if this development were allowed to progress too far, contract law would drown in a sea of tort," the Court answered in the negative the question that it posed at the outset of the case: "whether a commercial product injuring itself is the kind of harm against which public policy requires manufacturers to protect, independent of any contractual obligation." Id.
 
 
 39
 The Court reasoned that "[w]hen a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong."[13] Id. at 871, 106 S.Ct. at 2302. A manufacturer is liable without negligence under strict products liability because "public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." Id. at 866, 106 S.Ct. at 2299. (quoting Escola v. Coca Cola Bottling Co., 24 Cal.2d 453, 462, 150 P.2d 436 (1944) (concurring opinion)). The manufacturer's duty of care was, for similar reasons, expanded to include protection against property damage. Id. at 867, 106 S.Ct. at 2300. While conceding that "damage to a product itself has certain attributes of a products-liability claim," the Court concluded that "the injury suffered--the failure of the product to function properly--is the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain." Id. at 867-68, 106 S.Ct. at 2300-01.
 
 
 40
 The Court reasoned that contract law provides adequate remedies in a commercial setting where the parties are generally of equal bargaining power. In this context, the parties are able to allocate between themselves the risks of defects. Id. at 872-73, 106 S.Ct. at 2302-03. Moreover, to the extent that the purchaser is unable to recover from the manufacturer the full measure of expectation damages that are available in a warranty or breach of contract action, it may insure against such losses. Id. at 873, 106 S.Ct. at 2303. "Society need not presume that [such] a customer needs [the] special protection" of an extracontractual remedy. "The increased cost to the public that would result from holding a manufacturer liable in tort for injury to the product itself is not justified." Id. at 872, 106 S.Ct. at 2302.
 
 
 41
 Plaintiffs argue that because Hvide contracted only to provide professional services and did not manufacture any part of the Oxy Producer,East River 's rationale for confining the parties to their contractual remedies does not apply. It is true that some jurisdictions recognize an exception to the economic loss rule when the underlying contract is for the provision of professional services.[14] See Consol. Edison Co. v. Westinghouse Elec. Corp., 567 F.Supp. 358, 365 (S.D.N.Y.1983) (New York cause of action for negligent performance of contractual duties should not be applied outside context of negligence in the performance of services); Morse/Diesel, Inc. v. Trinity Indus., Inc., 664 F.Supp. 91 (S.D.N.Y.1987), rev'd on other grounds, 859 F.2d 242 (2d Cir.1988);[15] cf. Republic Steel Corp. v. Penn. Engineering Corp., 785 F.2d 174, 182 n. 13 (7th Cir.1986) (not reaching question whether Illinois law recognized such an exception because contract found to be predominantly for sale of goods); Adams Labs v. Jacobs Engineering Co., 761 F.2d 1218, 1223 (7th Cir.1985) (whether Illinois would recognize exception to economic loss rule for design professionals unclear). But see Flinkote Co. v. Dravo Corp., 678 F.2d 942, 949-50 (11th Cir.1982) (Georgia courts would not recognize exception to economic loss rule for professional services--particularly where services were rendered in process of manufacturing or constructing a product).
 
 
 42
 The question before us is whether such an exception should be recognized in maritime tort. We conclude that East River 's broad concern for preserving the integrity of contract law in commercial settings applies equally to a case such as this where the professional services are an integral part of the manufacture or construction of a product and where the only injury alleged is to the product itself.
 
 
 43
 As in East River, the damage alleged here is purely economic. Thus, the public policy concerns which underpin the imposition of a duty in tort--the need to provide consumers with greater protection from personal injury and property damage than is afforded by warranty or contract--are not implicated.[16] 476 U.S. at 866, 106 S.Ct. at 2299; see also Prosser & Keeton on Torts 693 (5th ed. 1984).
 
 
 44
 The only remaining reasons for concluding that contract law does not provide an adequate remedy for a buyer of professional services who incur purely economic loss are (1) it may be more difficult to define in a contract what constitutes satisfactory performance of services and (2) contracts for services are not subject to the implied warranties of the Uniform Commercial Code.[17] We find that neither of these considerations provides an adequate reason for imposing an extracontractual duty on one who contracts to provide professional services in a commercial context.
 
 
 45
 We recognize that in some cases it may be more difficult to define what constitutes the satisfactory performance of services than it is to define what constitutes a satisfactory product.[18] See PPG Indus., Inc. v. Sundstrand Corp., 681 F.Supp. 287, 290 (W.D.Pa.1988). This problem is minimized, however, when the parties possess equal bargaining power. In such cases, the parties are capable of bargaining for a definition of adequate performance that focuses on either "outcome" or "effort." See Comment, Guidelines for Extending Implied Warranties to Service Markets, 125 U.Pa.L.Rev. 365, 382-86 (1976) (discussing differing effects of "effort-oriented" and "outcome-oriented" standards). The contract could incorporate a guarantee that the contract will be performed in a "workmanlike" manner.[19] Alternatively, when the services are directly related to the manufacture of a product, the parties may impose a higher standard, defined with reference to the product itself.[20]
 
 
 46
 A more significant reason for imposing an extracontractual duty of care on sellers of services, but not on sellers of goods, may be that contracts for services are not governed by the U.C.C.[21]
 
 
 47
 There are particularly strong reasons for leaving to the U.C.C. commercial disputes over economic losses stemming from defective products because "[t]he maintenance of product value is precisely the purpose of express and implied warranties."[22] East River, 476 U.S. at 872, 106 S.Ct. at 2302 see also Prosser & Keeton on Torts, supra at 708-09 (risk of harm to the product itself is type of risk that parties to purchase and sale contracts should be allowed to allocate pursuant to the terms of the contract--especially in the commercial context); Note, Privity Revisited: Tort Recovery by a Commercial Buyer for a Defective Product's Self-Inflicted Damage, 84 Mich.L.Rev. 517 (1985) (arguing that imposition of tort liability in cases where the parties are in privity and the product injures only itself does not achieve optimal allocation of risks). On the rationale of East River, the implied warranties provided by Article II of the U.C.C. are an adequate replacement for the imposition of a duty in tort when the defective product has injured only itself.
 
 
 48
 Arguably, because contracts for services are not subject to the implied warranties provided by the U.C.C., it is necessary to impose a duty of proper performance in tort in order to provide the buyer of services with analogous protection from economic loss.[23] See Note, Extending Implied Warranties, supra, at 393 (because no implied warranties apply to contracts for services, an aggrieved buyer must rely on a tort remedy). This rationale is persuasive in a noncommercial context where the purchaser of services is not in a position to bargain for a specific guarantee of the quality of the service. See generally, id. (arguing for extension of implied warranties to certain service markets in order to protect consumers).
 
 
 49
 In a commercial context, however, parties are generally capable of allocating the risk of defective performance of a contract for services in the same way that they can allocate the risk of a defect in the product itself.[24] While the commercial purchaser of services will not have the benefit of implied warranties imposed by the U.C.C., it may bargain--as mentioned above--for an express warranty of workmanlike performance or for an express warranty defined in terms of the quality of the finished product.[25] The contract price would then turn in part on whether the provider of services is willing to guarantee that its performance of the contract will be satisfactory.
 
 
 50
 At least one district court has agreed with this analysis, finding East River to be persuasive authority for applying the economic loss rule to a commercial party's claim of negligent performance of a contract for professional services. In PPG Industries, a non-maritime case involving a dispute over an engineering agreement, the court noted that "the special non-contractual duties of professionals such as doctors, lawyers and architects enforced by tort law were created in part to make up for the lack of sophistication and bargaining power of those seeking these professional services." 681 F.Supp. at 290; see also Flinkote, 678 F.2d at 949-50 (finding no reason to except contractors or other professionals from Georgia economic loss rule).
 
 
 51
 The Supreme Court emphasized in East River that in a commercial context there are rarely disparities in the bargaining power of the parties that would justify the imposition of such extracontractual duties. 476 U.S. at 872-73, 106 S.Ct. at 2302-03. Like the court in PPG Industries, we find this to be equally true where the parties to a contract for services are sophisticated commercial entities, "adept at negotiating complex agreements and allocating risks between them." 681 F.Supp. at 290; see also Note, Privity Revisited, supra, at 532-39 (arguing that where parties are of equal bargaining power, as in most commercial cases, the parties themselves are best able to allocate the risk of defects).
 
 
 52
 Hvide and Occidental are both sophisticated commercial actors, capable of anticipating and allocating the risk of the type of economic loss that occurred in this case, and of insuring against the possibility that such losses may not be recovered in a breach of warranty or contract action. There is no reason for society to presume that a commercial entity such as Occidental "needs special protection." East River, 476 U.S. at 870, 106 S.Ct. at 2301; see also Note, Privity Revisited, supra at 532-39. Whether the negligence alleged is in the performance of a contract for services, or in a contract for the sale of goods, the resulting economic loss "is essentially the failure of the purchaser to receive the benefit of its bargain--traditionally the core concern of contract law." East River, 476 U.S. at 870, 106 S.Ct. at 2301.
 
 
 53
 We do not hold that a tort cause of action may never be stated in admiralty when the only damages sought are economic.[26] Id. at 871 n. 6, 106 S.Ct. at 2302 n. 6. We hold only that a plaintiff may not recover purely economic losses on a theory of negligent performance of a contract for professional services when the services were rendered as a part of the manufacture or construction of a product. That is, a party that provides professional services as part of the manufacture or construction of a product has no duty in maritime tort, independent of its contractual obligations, to prevent the product from injuring itself.[27] See id. at 876, 106 S.Ct. at 2304.
 
 
 54
 To hold otherwise would allow a plaintiff who contracts separately for "services" related to the manufacturing process--such as the design of the product or the supervision of the contract work--to recover in tort for purely economic losses from the provider of those services while East River would bar any similar recovery in cases in which those same services are performed by the manufacturer itself.[28] Creating an exception to the economic loss rule for professional services when those services are performed "only in the process of manufacturing or constructing a product" would "effectively eviscerate the economic loss rule" adopted in East River. See Flinkote, 678 F.2d at 950.
 
 
 55
 We conclude then, that following East River, Occidental's negligence claims against Hvide are not cognizable in maritime tort. This holding does not, however, eliminate our jurisdiction over the claims remaining in this case. We may, within our discretion, retain jurisdiction over the pendent contract claims that would not otherwise be within the admiralty jurisdiction if "considerations of judicial economy, convenience and fairness to litigants" would be served by doing so.[29] United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); Ingram Corp. v. J. Ray McDermott & Co., 698 F.2d 1295, 1320 (5th Cir.1983).
 
 
 56
 Prior to East River, plaintiffs' negligence claims were, under the law of this circuit, clearly cognizable in maritime tort. Jig the Third Corp. v. Puritan Marine Insurance Underwriters Corp., 519 F.2d 171, 175-76 (5th Cir.1975). East River, which effectively overruled the Fifth Circuit rule, Shipco, 825 F.2d at 927, was decided two weeks after the district court had rendered its decision in this case, at the conclusion of a three and one half month bench trial. "Considerations of judicial economy, convenience and fairness to the litigants" thus weigh heavily against dismissing the pendent claims at this late date.[30] Accordingly, we will retain jurisdiction over the remaining claims.
 
 
 57
 We turn now to the district court's resolution of those claims.
 
 
 58
 B. Did the district court err in finding that Avondale and Hvide breached their contracts by failing to deliver a properly mated and seaworthy vessel and that this was the sole cause of the sinking of the Oxy Producer?
 
 
 59
 After a lengthy bench trial, the district court concluded that the Oxy Producer had not been mated in accordance with the plans and specifications and that this failure had rendered the vessel unseaworthy on delivery. The district court found that Avondale breached its Construction Contract by failing to comply with the plans and specifications[31] and that Hvide had breached its Supervision Agreement by failing to insure that the plans and specifications were followed.[32] The district court also held that the improper mating of the vessel was the sole cause of the sinking of the Oxy Producer.
 
 
 60
 The district court's holding that the vessel was not properly mated is a finding of fact and will not be disturbed on appeal unless it is clearly erroneous. Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954) (clearly erroneous rule applies to review of judgment of trial court sitting in admiralty). Issues concerning breach of contract and warranty are also treated as fact and are therefore subject to the clearly erroneous standard of review. Automated Med. Laboratories v. Armour Pharm. Co., 629 F.2d 1118 (5th Cir.1980) (contract); Noel v. Kline, 325 F.2d 496 (5th Cir.1963) (contract); Martin v. Xarin Real Estate, 703 F.2d 883, 889 (5th Cir.1983) (warranty). Questions of negligence and causation are similarly treated as fact. Kratzer v. Capital Marine Supply, Inc., 645 F.2d 477 (5th Cir.1981) (negligence); Consolidated Grain & Barge Co. v. Marcona Conveyor Corp., 716 F.2d 1077 (5th Cir.1983) (causation).
 
 
 61
 "[A] finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson, 470 U.S. at 573, 105 S.Ct. at 1511. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.... This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." Id. at 573-74, 105 S.Ct. at 1511.
 
 
 62
 For the reasons set forth below, we find no clear error in the district court's findings of fact.
 
 1. The Mating of the Vessel
 
 63
 The district court noted that the Barge Specifications contained detailed instructions regarding the amount of contact required between the tug and the barge along the greenheart surfaces.[33] The specifications also provided that the contractor should measure the contact to ensure that the fit was proper. It was undisputed, however, that the measurements taken by a Hvide employee, Robert Bibbo, revealed that the specified amount of contact had not been achieved at the final mating. The district court concluded that "the Oxy Producer was delivered with virtually no greenheart contact and large gaps between the tug and the barge along its greenheart surfaces. The vessel therefore was not constructed in accordance with the plans and specifications."
 
 
 64
 The court further found that the damage sustained by the vessel on September 12, 1981 "was caused solely by the poorly mated condition in which Avondale delivered the vessel. Had the vessel been delivered with the percentage of contact between the tug and the barge along the greenheart surfaces required by the plans and specifications, no significant movement would have developed and no damage would have been sustained." The court held that these same factors were responsible for the sinking of the tug on September 20.
 
 
 65
 Avondale and Hvide dispute the district court's holding on several grounds. Avondale argues first, that Bibbo's measurements may not have been taken under the conditions required by the Barge Specifications. Second, Avondale notes that the specifications prescribe the percentage of contact to be achieved before sea trials and not at the final mating. Third, Avondale argues that because Hvide had extensive experience in the mating of ITBs, the district court should have deferred to Hvide's "interpretation" of the specifications. According to Avondale, the Oxy Producer's strong performance at sea trials was a better indication of the adequacy of the fit than were the measurements.
 
 
 66
 There is evidence in the record, however, to support each of the district court's findings. First, despite Avondale's post-hoc explanations for Bibbo's measurements, no evidence was presented that directly contradicted the measurements. The district court noted, moreover, that Carlton Ledet, the Avondale engineer responsible for mating the vessel, admitted that he did not take any steps to insure that there was sufficient contact before the vessel was delivered,[34] even though the adequacy of contact could readily be measured. Ledet went so far as to testify that had he known of Bibbo's measurements, he would have found the fit-up inadequate. Certainly the district court could find that these factors undermined the credibility of Avondale's post-hoc explanations for the unfavorable measurements.
 
 
 67
 Second, although the specifications did not refer explicitly to the final mating, the court relied on the testimony of Roderick Hulla, a naval architect employed by J.J. Henry, who expressed the view that contact in the range of 85-90%, as provided in the specifications, was necessary to avoid rapid greenheart wear and sudden decompression of the linkage system. It was Hulla's opinion that failure to achieve the specified percentage of contact could cause the greenheart to wear down more rapidly, leading to a sudden loss of friction and relative movement between the tug and the barge. This theory supports the view that it was necessary to comply with the specifications at the final mating and not simply before the sea trials.
 
 
 68
 Hvide argues that Hulla's opinion regarding the consequences of a failure to comply with the specifications was pure speculation and did not provide an adequate basis for the court's finding that the improper mating of the vessel initiated the chain of events leading to the loss of the Oxy Producer.[35]
 
 
 69
 The fact that the trial judge relied heavily on Hulla's testimony does not, however, render his decision clearly erroneous. The trial judge stated in his memorandum opinion that "[e]ach party's experts presented a different theory of the casualty. These theories varied widely and were often marred by the experts' obvious bias. Their tendency to be advocates and to protect the parties which called them often made their explanations obscure and illogical." The ability to assess the credibility of witnesses is at the heart of the trial court's function and is not a matter for the appellate court to second guess.
 
 
 70
 The fact that Avondale and Hvide are able to produce examples of testimony that appear to contradict the district court's findings does not, therefore, persuade us that the findings are clearly erroneous. In sifting through a vast array of competing evidence, the trial judge must evaluate the credibility of the witnesses and determine whose account of the events is most persuasive: "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." Anderson, 470 U.S. at 575, 105 S.Ct. at 1512.
 
 
 71
 The district court found Mr. Hulla to be the most "candid and responsive" of the expert witnesses. Hulla presented a "coherent and facially plausible" theory that was supported by the evidence. We therefore find no clear error in the district court's reliance on Hulla's testimony as a basis for its findings that the vessel was not properly mated on delivery. We agree that Avondale and Hvide breached their contracts with Occidental in failing to insure that the vessel was properly mated.
 
 2. Alternative Theories of Causation
 
 72
 We will next address the district court's finding that the improper mating of the vessel was the sole cause of both the damage to the Oxy Producer on September 12 and the sinking of the tug on September 20.
 
 
 73
 a. Failure to Adjust the Fit
 
 
 74
 Defendants argued at trial that the relative movement between the tug and the barge which began on September 12 was due to Occidental's failure to tighten the fit following the first voyage. Again, the district court relied on Hulla's testimony in rejecting this argument. Hulla explained that if the vessel had been properly mated at the outset, the greenheart would wear down and, with periodic tightening, would achieve nearly 100% contact. If, however, the vessel was not properly mated, the greenheart would wear down too rapidly, causing a relatively sudden loss of friction. Referring to the testimony of the crew, and to Bibbo's measurements, the district court found that the events leading up to the sinking of the Oxy Producer were most consistent with the second theory. Bibbo's measurements disclosed that there was contact at only a few "high spots" in the greenheart, the situation that Hulla testified was likely to result in a sudden loss of friction. The theory was supported further by the crew's observations, prior to the 12th, that there had been significant bulges in the neoprene pads indicating that the pads were under compression and that the fit was satisfactory. Furthermore, the relative movement between the tug and the barge did not increase gradually, but increased suddenly when the vessel encountered heavy weather on September 12. The district court found that the sea conditions either knocked the vessel off of its high spots, or caused it finally to wear off of its high spots.
 
 
 75
 The defendant's objections to the district court's findings establish at most that there are several plausible explanations of the events. The district court's choice of one of several permissible views of the evidence cannot constitute clear error. Anderson, 470 U.S. at 574, 105 S.Ct. at 1511.
 
 
 76
 b. Negligence of the Captain
 
 
 77
 Avondale also argued at trial that even if the relative movement was caused initially by improper mating of the vessel, the negligence of the crew was an intervening or contributing cause in the damage sustained by the vessel on September 12 and in the sinking of the tug on September 20. The district court held that Avondale failed to carry its burden of proving this affirmative defense with respect to the events of both September 12 and September 20.[36] The court's finding that the Captain acted reasonably in setting sail for the Azores in order to effect repairs is supported by the expert testimony and is not clearly erroneous.
 
 
 78
 The court also found that the Captain had been diligent in his attempts to obtain entry into the harbor at Ponta Delgada and had not acted unreasonably in setting out to sea on September 20.
 
 
 79
 While the harbor officials testified later that they would have permitted the Oxy Producer to enter the harbor if they had known that the vessel was in peril, the district court discounted this testimony as speculative. Given that the ultimate decision was not in the Captain's hands, and considering the range of factors that could affect the Harbor Master's decision whether to grant permission to enter, the district court's assessment of this evidence is certainly permissible.[37] The district court properly concluded that the mere possibility that the Captain might have obtained permission to enter the harbor if he had been more insistent did not establish that he was negligent.
 
 
 80
 Avondale next argues that the district court judge failed to apply the proper legal standard to judge the Captain's conduct on September 20. The district court invoked the doctrine of in extremis which holds that "where, without prior negligence, a vessel is put in the very center of destructive natural forces and a hard choice between competing courses must immediately be made, the law requires that there be something more than mere mistake of judgment by the master in that decision in extremis." Boudoin v. J. Ray McDermott & Co., 281 F.2d 81, 84 (5th Cir.1960).
 
 
 81
 Avondale argues that the circumstances confronting the Captain on September 20 were not sufficiently severe to warrant application of the in extremis doctrine and that the Captain's conduct should have been judged according to the ordinary "prudent seaman" standard.
 
 
 82
 Avondale contends that a predicted storm does not constitute sudden peril because "it is the nature of the calling of the shipmaster to know the tempestuous forces of wind and tide and seas." Boudoin, 281 F.2d at 84 (application of in extremis doctrine inappropriate where storm tides from hurricane were predicted several days in advance).
 
 
 83
 The heavy weather predicted for September 20 was not, however, the only difficulty facing Captain Kanellos. His disabled vessel, which carried a hazardous cargo, had been denied entry into the harbor. Moreover, another storm moved into the area early on the 20th, exacerbating the heavy seas created by tropical storm Harvey.[38] While these factors may not have placed the vessel in "sudden peril," we think that the district court was justified in finding that the combination of these factors presented "a situation of sufficient peril and immediacy to require application of a standard of law different from the standard of ordinary maritime negligence." M.P. Howlett Inc. v. Tug Michael Moran, 425 F.2d 619, 623 (2d Cir.), cert. denied, 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970).
 
 
 84
 The district court properly evaluated the Captain's conduct in light of the principle that:
 
 
 85
 The master of a vessel caught in an emergency where he is forced to choose between risky alternatives, is entitled to a wide range of discretion in deciding what to do, provided it is a reasonable exercise of current standards of nautical knowledge and skill under the circumstances. It does not become negligence because the decision he makes may later, in the light of subsequent events revealed through hindsight, be shown to have been wrong.
 
 
 86
 Esso Standard Oil S.A. v. S.S. Gasbras Sul, 387 F.2d 573, 580 (2d Cir.1967), cert. denied, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968).
 
 
 87
 In arguing that Captain Kanellos was imprudent, Avondale relies on our decision in Boudoin in which we held that a shipmaster's decision to remain docked in the face of an oncoming hurricane, rather than sailing upriver to a more protected harbor, was imprudent. A central factor in our holding in Boudoin, however, was that there was no showing that the tug master evaluated his options critically and made a conscious decision that it would be safer to remain at the dock rather than moving his vessel to another port. 281 F.2d at 86. The experts who testified in Boudoin all agreed that a prudent seaman would not have remained docked in light of the weather forecasts. Furthermore, there was no evidence that taking the vessel upriver would have been dangerous before the onset of the hurricane was imminent. Id. at 87.
 
 
 88
 The instant case is readily distinguishable from Boudoin. First, there is ample evidence that Captain Kanellos carefully considered his options (none of which could be guaranteed to succeed) and made a conscious decision that the risk of dragging anchor, running aground, and spilling the vessel's hazardous cargo outweighed the risk of attempting to maneuver the vessel away from the breakwater. Second, the experts who testified at trial did not agree on one prudent course of action.[39] Finally, at least one expert agreed with Captain Kanellos that remaining at anchor could have been dangerous.[40]
 
 
 89
 The district court found that the expert testimony established, at most, that another course of action might have been successful and that this was not enough to establish that the Captain's actions had been unreasonable under the circumstances. We agree. "The standard of judging the exercise of prudent seamanship here was tempered by the requirement for decision under very difficult, abnormal circumstances and the error, if there was error, was not negligence." Tug Michael Moran, 425 F.2d at 623 (citations omitted). The district court did not err in holding that Avondale failed to establish that the imprudence of the Captain was an intervening or contributory cause in the loss of the Oxy Producer. The district court must, however, decide whether the events discussed in this section were foreseeable for purposes of determining damages for breach of contract. See supra note 36; Skibs A/S Gylfe v. Nat'l Cargo Bureau Inc., 438 F.2d 803, 805 n.1, 807-08 (6th Cir.1971) (distinguishing "superceding" and "intervening cause" as used in tort from "forseeability" in determining damages for breach of contract).
 
 
 90
 c. Negligence or Breach of Contract by Henry and Victoria
 
 
 91
 The district court also rejected the contention that the cause of the damage sustained by the Oxy Producer on September 12 was the defective design and manufacture of the interconnection system as a whole and the bumper pads and link arms in particular. The district court found that this theory was inconsistent with the physical evidence, with the testimony of every other expert in naval architecture and marine engineering, with the crewmembers' testimony regarding the fore and aft direction of the movement between the tug and barge, and with the fact that no lateral movement appeared before September 12. Again, we find no clear error in the district court's assessment of the evidence.
 
 
 92
 Having concluded that the sole cause of the damage to the Oxy Producer was the improper mating of the vessel, the district court held that Henry and Victoria were not liable to the plaintiffs for any damage to the Oxy Producer. Because we find no clear error in the district court's findings of causation, we agree with this conclusion. However, we address below in section G the propriety of dismissing Henry and Victoria from the lawsuit in light of the additional claims regarding the Oxy Producer's sister ships--the Oxy Grower and the Oxy Trader.
 
 
 93
 We affirm the district court's finding that both Avondale and Hvide breached their contracts with Occidental by failing to deliver a properly mated and seaworthy vessel. We furthermore affirm the district court's holding that the improper mating of the vessel was the sole cause both of the damage sustained by the Oxy Producer on September 12, and of the sinking of the tug on September 20.
 
 
 94
 C. Was Hvide's acceptance of the vessel binding on Occidental?
 
 
 95
 Avondale contends that even if the loss of the Oxy Producer was caused by the improper mating of the vessel, Hvide's acceptance of the fit-up was binding on Occidental because the Supervision Contract vested Hvide with the power to accept or reject work or materials provided by Avondale. Avondale essentially argues that Hvide's acceptance of the vessel insulated Avondale from liability for any deficiencies in its own work. This argument is implausible. While Hvide was engaged to supervise the construction of the vessel, Avondale undertook an independent contractual obligation to construct the vessel according to the plans and specifications. See supra note 31.
 
 
 96
 The district court correctly found that Hvide had no actual authority to unilaterally modify the requirements of the plans and specifications[41] in a fashion that would be binding on Occidental because the Supervision Agreement expressly provided that Hvide was an independent contractor.[42] 2]
 
 
 97
 Avondale notes, however, that this holding did not necessarily dispose of the question whether Hvide had apparent authority to bind Occidental. The two inquiries are distinct:
 
 
 98
 While actual authority is the result of the principal's consent manifested to the agent, apparent authority is the result of consent manifested to the third party. The apparent authority for which a principal can be held liable must be traceable to him; it cannot be established by the unauthorized acts, representations, or conduct of the agent.
 
 
 99
 Strip Clean Floor Refinishing v. N.Y. District Council Brotherhood of Painters, 333 F.Supp. 385, 396 (E.D.N.Y.1971). Thus, Hvide's acceptance of the mating of the vessel would be binding on Occidental only if Occidental represented to Avondale that modifications of the plans and specifications by Hvide would be binding on Occidental and would relieve Avondale of its independent obligation to follow the plans and specifications.
 
 
 100
 A third party in Avondale's position may not assume the existence of such authority. Rather, a party who does business with an agent does so at his or her own peril: "[T]he principal will not be bound by the act of his agent in excess of his actual authority where the party doing business with the agent knows the extent of the latter's authority, or where the facts and circumstances are such as to put him on inquiry as to the power and good faith of the agent." Id. (emphasis in original); Legal Aid Soc'y of N.E.N.Y. v. Economic Opportunity Comm'n of Nassau, 132 A.D.2d 113, 521 N.Y.S.2d 833 (1987) (party dealing with an agent must make necessary effort to discover actual scope of agent's authority). The circumstances of this case indicate that Avondale should have taken steps to confirm the scope of Hvide's authority. It was clear from the terms of the Construction Contract that any deviation from the plans and specifications would expose Avondale to liability. The contract provides that Avondale should confer with the "Purchaser"--Occidental--in the event that it encountered any "discrepancy, error, omission or lack of clarity in the Vessel Plans and Specifications" and that any work performed by Avondale based on a "discrepancy, error, omission or lack of clarity" about which Avondale knew or should have known would be at Avondale's own risk unless Avondale had first received clarification from Occidental. In light of these factors, any reliance by Avondale on Hvide's "apparent" authority to bind Occidental by accepting work not in conformity with the plans and specifications, with no attempt to confirm that such deviations were acceptable to Occidental, was manifestly unreasonable and unjustified.[43]
 
 
 101
 We conclude that the district court properly found that Hvide's acceptance of the vessel was not binding on Occidental and therefore did not relieve Avondale of liability for its own breach of contract.
 
 
 102
 D. Avondale's Liability under the Construction Contract
 
 
 103
 The district court found that the specifications for the tug and the barge contained an express warranty that the vessel would be seaworthy on delivery which was incorporated into the Construction Contract[44] and that this warranty was not disclaimed or subject to the provisions limiting Occidental's remedies or Avondale's liability. The district court then found that Avondale breached both its express warranty that the vessel would be constructed in accordance with the plans and specifications and its warranty that the vessel would be seaworthy upon delivery.
 
 
 104
 Avondale maintains first that the language in the plans and specifications referring to seaworthiness does not create an express warranty, and second, that if there is a warranty of seaworthiness, it is subsumed in the guarantee deficiency clause of the contract and is therefore subject to the exclusive remedy of repair and replacement.
 
 
 105
 The parties agree that the Construction Contract is governed by New York law. It is unclear whether, under New York law, contracts for the construction of a vessel are subject to the U.C.C. Compare In re American Export Lines, 620 F.Supp. at 515 (contract for the construction of a vessel is predominantly for services and is therefore not governed by the U.C.C.) with Silver v. Sloop Silver Cloud, 259 F.Supp. at 191 (applying U.C.C. to contract for construction of a vessel). Because our conclusions would be the same under either the New York U.C.C. or New York common law, we do not decide this issue.
 
 1. Warranty of Seaworthiness
 
 106
 Under New York law, "a warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely."[45] Pittsburgh Coke & Chemical Co. v. Bollo, 421 F.Supp. 908, 928 (E.D. N.Y.1976), aff'd, 560 F.2d 1089 (2d Cir.1977). We agree with the district court that the language in the specifications constituted an express warranty that the vessel would be seaworthy on delivery[46] and that the warranty is incorporated into the Construction Contract by Article III(a) of the contract. The language of the specifications indicates that the object of the contract work is the building of a seaworthy vessel.
 
 2. The Guarantee Deficiency Clause
 
 107
 We find, however, that the warranty of seaworthiness is subsumed in the guarantee deficiency clause.[47] "Guarantee Deficiency" is broadly defined as:
 
 
 108
 [A]ny weakness, deficiency, failure, breaking down or deterioration in workmanship or material produced or furnished by the Contractor in performing the Contract Work or any failure of any equipment, machinery or material produced or furnished by the Contractor or a vendor or subcontractor of the Contractor to function as prescribed by the Vessel Plans and Specifications.
 
 
 109
 Seaworthiness is a qualitative statement which may mean something more than the failure of the contractor to comply with the plans and specifications: not every such failure would render the vessel unseaworthy.[48] Thus, a deficiency that causes the vessel to be unseaworthy may be more serious than one that does not.[49] Nevertheless, the plain language of the guarantee deficiency clause sweeps broadly to include deficiencies of varying degrees of severity.[50] Looking to the plain language of the contract, we cannot conclude that "any ... deficiency" does not include those deficiencies which render the vessel unseaworthy.[51]
 
 
 110
 The district court's finding that the vessel had not been mated in accordance with the specifications falls precisely within the definition of guarantee deficiency: Avondale's failure to mate the vessel properly was a "deficiency ... in workmanship ... in performing the Contract Work."
 
 
 111
 The fact that the contract narrowly restricts the remedies that are available for guarantee deficiencies to "repair or replacement" does not render this clause unconscionable, nor should it prompt a court to engage in tortured interpretation of the contract:[52]
 
 
 112
 Within the framework of this commercial transaction the Court perceives no valid legal reason why [the plaintiff] should not be held to the clear and express terms of the written agreement between the parties. Warranty and limitation of liability clauses such as found in the present contract, which restrict [the plaintiff's] remedies to the repair and replacement of non-conforming parts and limit [the defendant's] liability, regardless of its negligence in causing such nonconformities, are valid and enforceable and have been consistently upheld by the courts.
 
 
 113
 American Elec. Power Co. v. Westinghouse Elec. Corp., 418 F.Supp. 435, 453 (S.D.N.Y.1976) (quoting Potomac Elec. Power Co. v. Westinghouse Elec. Corp., 385 F.Supp. 572, 575 (D.D.C.1974), rev'd and remanded on other grounds, 527 F.2d 853 (D.C.Cir.1975)). The warranty of seaworthiness is no different from other express warranties of the quality or performance of goods which have, in other cases, been subject to a similar limitation of remedies.
 
 
 114
 a. Failure of the Exclusive Remedy
 
 
 115
 Plaintiffs maintain, however, that even if the warranty of seaworthiness is subsumed in the guarantee deficiency clause, the exclusive remedy provision is inoperative because circumstances have caused the remedy to fail of its essential purpose within the meaning of section 2-719(2) of the U.C.C. Section 2-719(2) provides that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act." 1A U.L.A. 493 (1976 & Supp.1988) The official comment provides further that "where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article." U.C.C. Sec. 2-719 comment 1, 1A U.L.A. 494.
 
 
 116
 Occidental argues that the purpose of the remedy was to bring the vessel into conformity with the plans and specifications. Because Avondale's initial failure to mate the vessel in accordance with the plans and specifications caused the tug to sink, the repair and replacement remedy was ineffective--the flaws in the mating of the vessel could not be corrected.
 
 
 117
 As noted above, it is not clear whether the Construction Contract is governed by the New York Uniform Commercial Code. It is therefore unclear whether section 2-719(2) of the U.C.C. is directly applicable.[53] However, even if we were to reason by analogy to the U.C.C., we conclude that the express terms of the contract, limiting Occidental's recovery to the cost of repairing or replacing guarantee deficiencies, are effective.
 
 
 118
 Where a seller "has been guilty of willful and dilatory behavior in not honoring" its promise to repair or replace, there is no doubt that the remedy has failed of its essential purpose. See, e.g., Computerized Radiological Services, Inc. v. Syntex Corp., 595 F.Supp. 1495 (E.D.N.Y.1984), aff'd in part, rev'd in part, 786 F.2d 72 (2d Cir.1986); American Electric, 418 F.Supp. at 435-54. In such cases, the seller has not only failed to deliver goods conforming to its warranties, it has also breached its promise to repair, or attempt to repair, the defects.
 
 
 119
 Courts are divided on the question whether the seller's inability to repair causes the remedy to fail of its essential purpose. On one hand, several courts have concluded that a seller's inability to repair or replace defective parts or workmanship constitutes a failure of the remedy. Consolidated Data Terminals, Inc. v. Applied Digital Data Systems, 708 F.2d 385, 392 (9th Cir.1983); S.M. Wilson & Co. v. Smith Int'l, Inc., 587 F.2d 1363, 1375 (9th Cir.1978). On this view, the buyer has bargained to receive a product of a particular quality. If repairs cannot bring the product into compliance with the warranty, the remedy has failed of its essential purpose, the buyer has been deprived of the substantial benefit of its bargain, and the buyer must have recourse to alternative remedies.
 
 
 120
 Other courts have found, however, that the seller's inability to repair or replace does not cause the remedy to fail. Rather, a contract may anticipate the possibility that repairs would not be sufficient to correct all defects. Potomac Electric, 385 F.Supp. at 578-79; U.S. Fibres, Inc. v. Proctor & Schwartz, Inc., 358 F.Supp. 449, 457, 465 (E.D.Mich.1972), aff'd, 509 F.2d 1043 (6th Cir.1975). On this view, the buyer has bargained for the seller's efforts to bring the product into conformity with the warranties. The risk that such efforts would not succeed has been allocated to the buyer.
 
 
 121
 The instant case differs from both lines of cases in that there was no opportunity to effect repairs because the sinking of the tug made both actual or attempted repairs by Avondale--or anyone else--impossible. Assuming that these circumstances caused the remedy to fail of its essential purpose to actually repair guarantee deficiencies, our inquiry is not complete. The Construction Contract further provides that "[t]he Contractor shall not be liable to the Purchaser for any damage to the Vessel or its equipment or cargo or other property of such purchaser or for consequential damages of the Purchaser arising out of any such Guarantee Deficiency." Avondale argues that this clause operates as an independent limitation of its liability--effectively allowing Occidental to recover only the cost of repairing guarantee deficienies.
 
 
 122
 b. Limitation of Liability
 
 
 123
 It is well established that under New York law the failure of a remedy to achieve its essential purpose does not render ineffective all other limitations of liability: "A better reading is that the exclusive remedy clause should be ignored; other clauses limiting remedies in less drastic manners and on different theories would be left to stand or fall independently of the stricken clause." Computerized Radiological Services, 595 F.Supp. at 1510; American Electric, 418 F.Supp. at 457.
 
 
 124
 Whether a separate limitation of damages will survive the failure of the exclusive remedy will frequently depend on whether the damages excluded by the challenged clause have resulted from the seller's willful or dilatory conduct in failing to comply with the remedy provision. Indeed, most New York cases have upheld a separate limitation of consequential damages when those damages stem from the seller's inability to repair rather than from a refusal to repair. This case, however, presents a third situation because "the [direct and] consequential damages suffered precede[d] the failure of the limited remedy and bear no relation to it." Eddy, On the "Essential" Purpose of Limited Remedies: The Metaphysics of UCC Section 2-719(2), 65 Calif.L.Rev. 28, 88-89 (1977). That is, the direct and consequential damages suffered by Occidental are not due to Avondale's failure to repair the guarantee deficiency. Rather, it is the extent of damage--the sinking of the tug--that caused the remedy to fail.
 
 
 125
 The facts of this case resemble those of Henningsen v. Bloomfield Motors, 32 N.J. 358, 161 A.2d 69 (1960), a pre-code case discussed in Eddy's article. In Henningsen, a defective part caused the plaintiff's automobile to swerve from the road injuring the plaintiff and damaging the car. The contract limited remedies to the repair or replacement of defective parts and excluded consequential damages. Eddy concludes that when the consequential damages do not flow from the failure to repair, but precede any opportunity to repair, the limitation of consequential damages should not be invalidated as having failed of its essential purpose--although the limitation might properly be considered unconscionable. Eddy, supra at 88-89. This case differs from Henningsen, however, in two respects: First, Henningsen was a classic consumer case. Second, the Construction Contract would allow recovery of the cost of repair.
 
 
 126
 It is by no means clear that limiting Occidental to recovery of the cost of repairs would be unconscionable or deprive it of an adequate remedy. Whether application of the clause would deprive Occidental of the substantial value of its bargain depends manifestly on what Occidental bargained for.
 
 
 127
 The cases discussed above, involving a seller's inability to repair, are instructive on this point. From these two lines of cases, it is clear that whether "circumstances" have caused a remedy to fail depends on whether the contract anticipated and allocated the risk that the exclusive remedy would not cure all defects.[54] Under the first line of cases, the court has concluded that the parties did not anticipate and allocate the risk that repairs would be unsuccessful--thus, the remedy fails of its essential purpose. Under the second line of cases, the court has concluded that the parties did anticipate, and allocate to the buyer, the risk that the repairs might not be effective--thus, the remedy does not fail of its essential purpose.
 
 
 128
 The question presented here is not simply whether the contract anticipates that efforts to repair may be ineffective, but whether it anticipates that repairs may be impossible.[55]
 
 
 129
 Although the circumstances which caused the repair remedy to fail had catastrophic results, those circumstances were not beyond the contemplation of the parties. The guarantee deficiency clause clearly recognizes the possibility that a deficiency could result in damage to the vessel and its cargo. The risk of such loss is allocated by the express terms of the contract to Occidental. If the damage to the Oxy Producer had been severe, but had not caused the tug to sink, the remedy would not have failed of its essential purpose and Avondale would be responsible, by the terms of the contract, only for the cost of repairing the underlying deficiency, not for any other damage caused by the deficiency--no matter how severe.
 
 
 130
 The fact that damage to the vessel caused it to sink, rendering the remedy of actual repair ineffective, does not require that the allocation of the risk of damage to the vessel be shifted to Avondale. The risk that the vessel would sink is only the most serious of the risks that the Construction Contract allocates by its plain terms to Occidental. While this allocation of risks may appear severe, it is not illogical.
 
 
 131
 One commentator has noted that "[a]s one moves into the realm of industry or commerce ... the goods sold become more complex and more frequently custom designed.... Where goods are not standardized or, in the extreme alternative, where they are experimental ... the reasonable expectations of the buyer become attenuated [and] the degree of risk imposed by an absolute construction of the repair duty becomes extensive." Eddy, supra, at 77, 80.
 
 
 132
 When the goods which are the subject of the contract are complex or innovative the contract may allocate the risk of defects differently than when the contract involves "standard" goods--such as automobiles. Id. at 80. Thus, in American Electric, the court emphasized that "the contract here in issue is not of the type entered into by the average consumer, but a commercial agreement painstakingly negotiated between industrial giants.... The rule that the agreed upon risk should not be disturbed is particularly appropriate where, as here, the warranted item is a highly complex, and in some ways experimental piece of equipment." 418 F.Supp. at 459.[56]
 
 
 133
 In the instant case, Avondale argues that because the design for the Oxy Producer was relatively novel, it was willing to assume only the most limited liability for possible defects. The contract reflects this allocation of risks. Occidental agreed that in the event of a guarantee deficiency, Avondale would be liable only for the cost of repairing or replacing deficiencies. It agreed that Avondale would not be liable for any damage to the vessel, its cargo, or its equipment, arising from such a deficiency. We will not disturb the agreed upon allocation of risks simply because the worst of those risks has materialized.
 
 
 134
 While this result may seem harsh, it is clear that two sophisticated commercial actors such as Avondale and Occidental could have allocated the risk of damage stemming from a guarantee deficiency differently. We note that the construction contract involved in Shipco provided that Avondale would be liable for damage to the vessel immediately caused by any guarantee deficiency. 631 F.Supp. 1123, 1126 n. 3 (E.D.La.1986) (quoting contract language) aff'd, 825 F.2d 925 (5th Cir.1987), cert denied, --- U.S. ----, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988). Under the terms of that contract, Avondale might have been liable for the loss of the vessel. Occidental, however, did not secure a similar promise with respect to the Oxy Producer.
 
 
 135
 Occidental and Avondale are "commercial giants" of equal bargaining power. Their lengthy negotiations produced a detailed contract of nearly 100 pages in length. We will not rewrite this contract to substantially alter the allocation of risks to which the parties have consented. See American Electric, 418 F.Supp. at 440 n. 2.
 
 
 136
 The district court should therefore determine the extent of the damages that Occidental may recover consistent with this holding.
 
 
 137
 E. Hvide's Liability under the Supervision Contract
 
 
 138
 We held above that under the economic loss rule adopted in East River, the plaintiffs' negligence claim against Hvide is not cognizable in maritime tort. We therefore do not need to reach the issue whether the Supervision Contract limits Hvide's liability in negligence. The parties do not dispute that the Supervision Contract limits Hvide's liability for breach of contract to $5 million.
 
 F. Joint and Several Liability
 
 139
 Because the district court has not yet determined the proportionate responsibility of Hvide and Avondale for the losses suffered by Occidental, and because our decision on appeal will affect the total amount of damages that can be recovered against each defendant, we decline to decide whether the imposition of joint and several liability is appropriate here. That question may be addressed after the district court has conducted proceedings to determine the extent and allocation of the damages.
 
 G. The Dismissal of Henry and Victoria
 
 140
 We affirmed above the district court's finding that the improper mating of the vessel was the sole cause of the sinking of the Oxy Producer and that there were no defects in the design or manufacture of the linkage system as a whole, or in the link arms or bumper pads. This holding, however, does not eliminate plaintiffs' claims regarding the sister ships. Following the sinking of the Oxy Producer, the Coast Guard revoked the certificates of inspection for the Oxy Producer's sister ships--the Oxy Trader and the Oxy Grower. After an inspection revealed damage in the linkage systems of the sister ships, parts of the linkage system were redesigned and replaced. Occidental sought to recover the losses it sustained in repairing the sister ships.
 
 
 141
 Although the district court's opinion states only that "Henry and Victoria are not liable ... for any damage suffered by the Oxy Producer," and does not address the sister ships explicitly, the court dismissed Henry and Victoria from the entire lawsuit.
 
 
 142
 Occidental contends that the district court's dismissal of Henry and Victoria was improper--at least with respect to the claims regarding the sister ships. While we affirm the district court's holding that Henry and Victoria are not liable for any damage to the Oxy Producer, we do not think that the dismissal of Henry and Victoria was proper without specific findings regarding the sister ships. We therefore reverse the dismissal and remand to the district court for resolution of these claims consistent with our holdings in this case.
 
 III.
 
 143
 The decision of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for determination of damages consistent with this decision, and for resolution of the claims regarding the sister ships.
 
 
 
 *
 District Judge of the Eastern District of Louisiana, sitting by designation
 
 
 [1]
 Occidental formed a subsidiary, Suwannee River SPA Finance, Inc. ("Finance"), for the purpose of constructing the Oxy Producer. To avoid further confusion, given the number of subsidiaries involved, we do not refer to Finance separately in the text although it was the original party to the contracts discussed above. Finance ultimately assigned its rights under the Supervision Agreement, the Henry Agreement, and the Construction Contract to the Oxy plaintiffs
 
 
 [2]
 Originally, three separate complaints were filed. The complaints were consolidated for trial
 
 
 [3]
 Contracts relating to the construction of vessels are not considered maritime contracts. Kossick v. United Fruit Co., 365 U.S. 731, 735, 81 S.Ct. 886, 889, 6 L.Ed.2d 56 (1961); Walter v. Marine Office of America, 537 F.2d 89 (5th Cir.1976). Consequently, claims for breach of such contracts are not within the admiralty jurisdiction. However, tort claims for negligent construction or design of a vessel will lie in admiralty if the negligence constitutes a maritime tort. Jig the Third Corp. v. Puritan Marine Ins. Underwriters Corp., 519 F.2d 171, 174 (5th Cir.1975)
 The district court correctly found that plaintiffs' negligence claims constituted maritime torts because (1) the harm allegedly caused by the tort occurred on the high seas--meeting the locality requirement for admiralty jurisdiction and (2) they occurred in the course of maritime commerce--satisfying the requirement that the tort bear a substantial relationship to traditional maritime activities. The district court also agreed to exercise pendent jurisdiction over the contract claims.
 Because admiralty jurisdiction was premised in this case on plaintiffs' tort claims, defendants contend that if East River bars those claims, the grounds for admiralty jurisdiction are eliminated.
 
 
 [4]
 The Supreme Court declined to decide whether the additional requirement of a "maritime nexus," necessary to establish admiralty jurisdiction over torts occurring on navigable waters within the United States, was also necessary to establish jurisdiction over torts occurring on the high seas. 476 U.S. at 864, 106 S.Ct. at 2298. Because the ships were engaged in maritime commerce, "a primary concern of admiralty law," the Court found that if there were a "maritime nexus" requirement it would have been met. Id. Similarly, there is a sufficient maritime nexus in this case to meet the second prong of the Executive Jet test
 
 
 [5]
 Defendants urge that Boson Marine 6 Ltd. v. Crown Point Indus., 854 F.2d 46 (5th Cir.1988), is "extremely pertinent" to the jurisdiction issue. In that case, we found that following East River, the plaintiff's efforts to recover on a theory of strict product liability for damages to the product itself did not state a claim cognizable in maritime tort law. While the court did affirm the district court's dismissal of the case for lack of subject matter jurisdiction, the basis for this affirmance is ambiguous
 After holding that the plaintiff's product liability claim was not cognizable in maritime tort, the Boson court also rejected the plaintiff's argument that there was an additional basis for admiralty jurisdiction. The court held that the defendant's promise to "take care of" any problems caused by the equipment did not amount to a contract to repair the vessel--which would be maritime in nature--but constituted at most a warranty of the equipment. The court then concluded that "[b]ecause a claim for breach of warranty is not within the admiralty jurisdiction," the case was properly dismissed for lack of subject matter jurisdiction. Id.
 It is therefore unclear whether the court in Boson was concluding that the product liability claims were "so patently without merit" in light of East River as to deprive the court of subject matter jurisdiction, or whether the tort claims were dismissed on their merits, and the dismissal for lack of subject matter jurisdiction upheld because there was no admiralty jurisdiction over the remaining warranty claim. (The fact that the court did not discuss the possibility of pendent jurisdiction over the warranty claim could indicate that the first holding was jurisdictional, but is hardly conclusive.)
 In any event, Boson may be distinguished from the instant case because the Boson plaintiff's tort claims--against the manufacturer of an allegedly defective product that caused injury only to itself--fell clearly within the parameters of the East River holding.
 
 
 [6]
 This approach does not place a burden on judicial resources because the court may render a decision on the merits early in the proceedings--on a Rule 12(b)(6) motion for failure to state a claim, or on a motion for summary judgment. If the federal claims are dismissed, and there is no other ground for federal jurisdiction, the district court may also dismiss any pendent state law claims
 
 
 [7]
 Our discussion focuses on the negligence claims against Hvide because the negligence claims against Avondale are not an issue on appeal. While the district court found that Avondale was negligent in its performance of the Construction Contract, it also found that the contract disclaimed liability in tort. That holding is not contested here
 The negligence claims against Avondale would, moreover, be precluded by our decision in Shipco 2295 Inc. v. Avondale Shipyards Inc., 825 F.2d 925 (5th Cir.1987) (applying East River economic loss rule to tort claims against shipbuilder), cert. denied, --- U.S. ----, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988).
 
 
 [8]
 The East River plaintiffs alleged that the defendant, "as part of the manufacturing process," negligently supervised the installation of a component part. 476 U.S. at 871, 106 S.Ct. at 2302
 
 
 [9]
 Indeed, in declining to foreclose altogether the possibility that "a tort cause of action could be stated in admiralty when the only damages sought are economic," the Court cites Ultramares v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931), a case allowing third parties to recover damages for negligence in the performance of a contract for professional services. 476 U.S. at 871 n. 6, 106 S.Ct. at 2302 n. 6
 
 
 [10]
 Defendants also argue that our decision in Shipco, "makes clear that even a designer of equipment, who was in no way involved--not even as a supervisor--in the manufacturing process, is still within the rule of East River." Defendants, however, are not entirely accurate in their characterization of this portion of our decision in Shipco. Shipco did not foreclose the possibility that a provider of services could be treated differently than a manufacturer or builder. In asserting the liability of the designer of the component part, the plaintiffs in Shipco did not rely on the distinction between a manufacturer and a provider of services. Rather, they argued that under East River 's "other property" exception, the designer of a component part could be held liable for damages to a vessel. We held that "[t]he critical fact [was] that Shipco bargained for a finished vessel." 825 F.2d at 929. The vessel therefore could not be treated as "other property" in relation to the allegedly defective component part
 While we agree with defendants that East River militates against drawing a distinction between a provider of services and a manufacturer, Shipco did not expressly decide whether the East River rule applies to a provider of services who is distinct from the manufacturer or builder.
 
 
 [11]
 Plaintiffs' assertion that defendants have waived their argument that the negligence claims against Hvide are not cognizable in maritime tort is without merit. We must apply the law in effect at the time of our decision, not the law that was in effect when the case was argued or decided by the district court. Bradley v. Richmond School Bd., 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); Nations v. Sun Oil Co., 695 F.2d 933 (5th Cir.), cert. denied, 464 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 229 (1983). East River effectively overruled the law of this circuit regarding the ability of plaintiffs to recover in maritime tort for purely economic losses. Shipco, 825 F.2d at 927. While the East River economic loss rule does not specifically include service contracts, neither has the Supreme Court or any circuit recognized an exception to the rule. Therefore, to determine whether plaintiffs' negligence claims are cognizable in maritime tort following East River, we must first determine the scope of the rule
 
 
 [12]
 To the extent that a contract for the construction of a vessel is considered to be a service contract, compare In re American Export Lines, 620 F.Supp. 490, 515 (S.D.N.Y.1985) (contract for construction of vessel is predominantly for services, and therefore is not governed by U.C.C.) with Silver v. Sloop Silver Cloud, 259 F.Supp. 187 (S.D.N.Y.1966) (applying U.C.C. to contract for construction of vessel), our holding in Shipco provides further support for our holding today. In Shipco, we applied the East River rule to tort claims against a shipbuilder without addressing explicitly the goods/services dichotomy
 
 
 [13]
 The Court also rejected as "too indeterminate" the intermediate land-based positions that allow recovery for damage to the product alone when the defect poses a risk of personal injury or damage to other property. 476 U.S. at 870, 106 S.Ct. at 2301
 
 
 [14]
 Plaintiffs argue erroneously that New York law is controlling on this point. While it is undisputed that New York law governs the interpretation of the Supervision and Construction Contracts, the question before us is whether plaintiffs' negligence claims are cognizable in maritime tort, not whether they are cognizable under New York law
 
 
 [15]
 These cases are remarkably silent on the reasons for excepting contracts for professional services from the economic loss rule
 
 
 [16]
 We reject plaintiffs' contention that the claims against Hvide fall within East River 's "other property" exception. We held in Shipco, that the designer of a component part could not be treated separately from the manufacturer for purposes of the "other property" exception. 825 F.2d at 928 (noting that East River involved an identical claim). Because the completed vessel was the object of the contract, the vessel itself could not be considered "other property" in relation to its component parts. Id. Hvide's services were similarly an integral part of the construction of the Oxy Producer. Therefore, the vessel itself cannot be regarded as "other property" in relation to Hvide's services
 Plaintiffs' argument that loss of the Oxy Producer's cargo constitutes damage to "other property" is also without merit. Louis Dreyfus Corp. v. 27,946 Long Tons of Corn, 830 F.2d 1321, 1328 n. 5 (5th Cir.1987) (loss of cargo is not damage to "other property" within meaning of East River ).
 
 
 [17]
 Admiralty law, of course, recognizes an implied warranty of workmanlike service which arises from contractual relationships. Ryan v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 133-34, 76 S.Ct. 232, 237-38, 100 L.Ed. 133 (1956). Other jurisdictions find that a similar standard of performance, analogous to a duty of care in tort, is implied in service contracts. See Milau Assoc. v. North Ave. Development Corp., 42 N.Y.2d 482, 398 N.Y.S.2d 882, 368 N.E.2d 1247, 1251 (Ct.App.1977) (citing Bloomsburg Mills, Inc. v. Sordoni Constr. Co., 401 Pa. 358, 164 A.2d 201 (1960); Union Mar. & Gen. Ins. Co. v. American Export Lines, 274 F.Supp. 123 (S.D.N.Y.1966); Pepsi Cola Bottling Co. v. Superior Burner Serv. Co., 427 P.2d 833 (Alaska 1967); Wolfe v. Virusky, 306 F.Supp. 519 (S.D.Ga.1969)). Unlike the implied warranties of the U.C.C., however, these warranties necessarily parallel a negligence standard rather than imposing strict liability
 
 
 [18]
 We note, however, that the standards which define satisfactory goods under the implied warranty provisions of the U.C.C.--merchantability or fitness for a particular purpose--are not terribly determinate. U.C.C. Secs. 2-314, 2-315, 1 U.L.A. 371-72, 482 (1976 & Supp.1988)
 
 
 [19]
 We note that the Supervision Contract contains an express warranty of workmanlike performance. Thus, it is clearly not unrealistic to expect that parties can bargain for such guarantees
 
 
 [20]
 While the quality of the services may be defined in terms of the quality of the finished product, this does not alter the fact that the Supervision Contract is one for the provision of services rather than for the sale of goods. The fact that the services were rendered as part of the construction of the Oxy Producer does, however, militate against excepting such service contracts from the economic loss rule. See infra note 28
 
 
 [21]
 The distinction between goods and services has been widely criticized, and has been particularly difficult to define in the context of "hybrid contracts"--such as construction contracts, contracts for repairs that involve the provision or replacement of a part, or sales contracts that include installation. See, e.g., J. White & R. Summers, Uniform Commercial Code 346-49 (2d ed. 1980); Article Two Warranties in Commercial Transactions: An Update, 72 Cornell L.Rev. 1159, 1199-1201 (1987) (suggesting that courts analogize services to goods where the buyer's reliance on the service provider resembles a buyer's reliance on a merchant when purchasing a good); Note, Disengaging Sales Law from the Sale Construct: A Proposal to Extend the Scope of Article II of the U.C.C., 96 Harv.L.Rev. 470 (1982); Comment, Extending Implied Warranties, supra. See also Prosser & Keeton on Torts, supra, at 720 (discussing difficulty of distinguishing sales and service contracts for purposes of determining whether action may lie in strict products liability)
 The difficulty of drawing this distinction further militates against excepting contracts for services from the economic loss rule. See infra note 28.
 
 
 [22]
 Allowing extracontractual remedies in tort may also defeat the U.C.C.'s goal of achieving uniformity and predictability in commercial transactions. See White & Summers, supra, note 21, at 20-21 (discussing goals of U.C.C.); Note, Disengaging Sales Law, supra, note 21, at 470 (same)
 
 
 [23]
 While implied warranties impose strict liability, their protective value is diminished by the fact that they may be disclaimed entirely, leaving the buyer with only an argument that the disclaimer at issue is unconscionable. This is mitigated in the consumer context by the provisions of the Magnuson-Moss Warranty Act which restrict substantially the parties' freedom to disclaim the implied warranty of merchantability
 
 
 [24]
 In limiting the buyers of defective commercial goods to their contractual remedies, New York courts have followed essentially the same rationale as the Supreme Court in East River: "Economic loss results from the failure of the product to perform to the level expected by the buyer and the seller.... The original purchaser, particularly a large company ... can protect itself against the risk of unsatisfactory performance by bargaining for a warranty." Consolidated Edison, 567 F.Supp. at 365 (quoting Schiavone Construction Co. v. Elgood Mayo Corp., 81 A.D.2d 221, 439 N.Y.S.2d 933, 939 (1982))
 Presumably, the New York courts have concluded that even a sophisticated party who contracts for the provision of services is less able to bargain for similar guarantees of a satisfactory performance.
 
 
 [25]
 A service contract containing such express warranties would be treated differently from a contract for the sale of goods only in that the U.C.C. will not govern a court's interpretation of disclaimers of express warranties. However, in construing a contract for services, courts are free to reason by analogy to U.C.C. Sec. 2-316(1). Moreover, it is unlikely that a substantially different outcome would result from the application of traditional common law contract principles
 
 
 [26]
 The Supreme Court left open the possibility that a party not in privity with the defendant could recover purely economic damages on a theory of negligent performance of a contract for professional services. 476 U.S. at 871 n. 6, 106 S.Ct. at 2302 n. 6 (citing Ultramares v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931) (allowing third party to recover economic loss resulting from negligent accounting)). That possibility, however, may be largely foreclosed by Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 309, 48 S.Ct. 134, 135, 72 L.Ed. 290 (1927) ("as a general rule, at least, a tort to the person or property of one man does not make the tort feasor liable to another merely because the injured person was under a contract with that other, unknown to the doer of the wrong"). See East River, 476 U.S. at 871 n. 6, 106 S.Ct. at 2302 n. 6
 
 
 [27]
 This rule applies only to parties who are in privity. We do not decide whether a party not in privity with the defendant may recover in negligence, see supra note 26
 
 
 [28]
 Under New York law, the economic loss rule applies only to the sales components of a contract and the courts appear willing to parse a single contract to determine the extent to which the party may recover economic loss in tort. Consolidated Edison, 567 F.Supp. at 366 n. 12 (whether contract is essentially one for goods or services for purposes of determining applicable statute of limitations not dispositive of extent to which claims for economic loss are cognizable in tort: economic loss may be recovered on negligence theory only to extent that claims relate to service component of contract)
 East River, however, appears to foreclose this approach. With respect to the plaintiff's allegation that the defendant, "as part of the manufacturing process," negligently supervised the installation of a component part, 476 U.S. at 861, 106 S.Ct. at 2297, the Court simply concluded that the defendant "owed no duty under a products-liability theory based on negligence to prevent the product from injuring itself." Id. at 876, 106 S.Ct. at 2304. The Court cites as support two cases that declined to except services rendered as part of a manufacturing or construction contract from the economic loss rule: S.M. Wilson & Co. v. Smith Int'l Inc., 587 F.2d 1363, 1372 (9th Cir.1978) (applying California law), and Flinkote, 678 F.2d at 950 (applying Georgia law). The Court therefore implicitly rejected the notion that the service component of a manufacturing contract could be segregated for purposes of the economic loss rule.
 In Republic Steel Corp., the Seventh Circuit, applying Illinois law, took a different approach. The court refused to segregate the service component of a contract for the engineering, design, sale, and installation of two furnaces as well as for purchase agency services. 785 F.2d at 182. Finding the contract to be primarily for the sale of goods, the court found it unnecessary to decide whether the Illinois economic loss rule applied to service contracts. Id. at 182 n. 13. Consequently, if there were an exception to the economic loss rule, it would apply only to contracts that were predominantly for services. Flinkote, which is cited in East River, held that construction contracts, which are generally held to be predominantly for services, were not excepted from the economic loss rule. 678 F.2d at 949-50.
 We do not think that the Supreme Court would treat hybrid sales-service contracts in which services predominate any differently than the hybrid contract at issue in East River. Indeed, we effectively refused to do so in Shipco in which we applied the economic loss rule to tort claims against a shipbuilder--even though contracts for the construction of a vessel are hybrid sales-service contracts in which services arguably predominate. See also Gulf Boat Marine Services, Inc. v. George Engine Co., 659 F.Supp. 6 (E.D.La.1986) (applying East River rule to a case including a claim that seller was negligent in repairing defective engine). For the reasons set forth above, we conclude that the intent of East River can be given effect only by recognizing a bright-line rule that extends the economic loss rule to all service contracts--whether "purely" for services or predominantly for services--where the services are rendered as part of the manufacture or construction of a product and the only injury alleged is to the product itself.
 
 
 [29]
 It is not disputed that the negligence claims and the contract claims arise from "a common nucleus of operative fact." Gibbs, 383 U.S. at 725, 86 S.Ct. at 1138
 
 
 [30]
 The Supreme Court emphasized in Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, ---- 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988), that "a federal court's determination of state-law claims could conflict with the principle of comity to the States." Thus,
 [w]hen the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its earlier stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.
 Id. at ----, 108 S.Ct. at 619. Given the advanced stage of these proceedings and the amount of judicial resources that are necessarily consumed in trying a case as cumbersome as this, we think that the balance of factors weighs clearly in favor of retaining jurisdiction over the pendent claims in this case.
 
 
 [31]
 Article II(a) of the Construction Contract provides that:
 The Contractor, at its own risk and expense, shall furnish all plant, facilities, working plans, labor, materials, supplies and equipment, and shall perform all work required under this Construction Contract and the Vessel Plans and Specifications to construct, launch, outfit, test and deliver the Vessel in accordance with the Vessel Plans and Specifications as defined in Article I hereof; and shall further, at its own risk and expense, do everything required of the Contractor by this Construction Contract and the Vessel Plans and Specifications. (emphasis added).
 Article XVI(a) provides that:
 a dock trial and a sea trial shall be held in order to determine whether the Vessel and its machinery and equipment are in proper working order and in accordance with the requirements of this Construction Contract, the Vessel Plans and Specifications and requirements of the Regulatory Agencies. (emphasis added).
 The district court also held that the Construction Contract contained an express warranty of seaworthiness which Avondale also breached. That issue is addressed below in Section D, and the relevant language from the specifications is set out infra at note 46.
 
 
 [32]
 Section 4(c) of the Supervision Agreement provides that:
 
 
 [4]
 Design
 (c) The Supervisor and HMI further jointly and severally warrant that the Vessel, if constructed by the Contractor in accordance with the Construction Contract and the Plans and Specifications, (i) will be complete and seaworthy, (ii) will be suitable for the carriage of superphosphoric acid from ports of the United States to the Soviet Union and for the carriage in worldwide service of petroleum products or any other lawful cargo in bulk for which the Vessel and its tanks are suitable and (iii) will perform in strict accordance with the Construction Contract and the Plans and Specifications. (emphasis added).
 Section 9 provides that:
 
 
 [9]
 Plan Approval. The Supervisor with HSI under the Subcontract shall review and shall cause Henry to review and approve all Contractor working plans and drawings and vendor plans and drawings according to the Construction Contract and the Plans and Specifications. The Supervisor shall also review any other plans and drawings submitted to it by the Owner or the Contractor for its review
 Section 10 provides that:
 
 
 [10]
 On Site Inspection. The Supervisor with HSI under the Subcontract shall provide qualified on-site supervisory staff which will perform construction inspection in respect of the construction of the Vessel. Inspection will be made to assure that the Vessel is constructed in accordance with the Construction Contract and the Plans and Specifications and in a sound and workmanlike manner. (emphasis added)
 
 
 [33]
 The interconnection system of the Oxy Producer is designed to hold the tug and barge together as an integrated vessel. A tongue-shaped projection from the aft end of the barge is fitted into a wedge-shaped recess formed by the catamaran hulls of the barge, the crossover deck connecting the two hulls on the top and the ledges protruding from the lower portion of each of the two tug hulls. Greenheart (a very hard wood) bearing surfaces are placed on the top of the barge tongue and along the upper surface of each tug ledge to achieve a tight, customized fit between the tug and the barge. Two link arms (described as "suitcase latches") are used to engage and disengage the tug and barge and to maintain the longitudinal engagement of the tug on the barge tongue
 With each of the link arms latched down and in tension, the main link pin at the head of the arm pulls against and compresses a steel/neoprene sandwich ("bumper pad"). The compression of the bumper pad causes the neoprene to "flow" upward creating a bulge between the steel plates, indicating that the barge and tug are properly fitted to prevent movement.
 Over time, the fit-up is intended to become tighter as the wedging action causes the steel structures to wear down the high spots on the greenheart. Ultimately, the contact along the greenheart will become uniform.
 
 
 [34]
 The tug and barge had been separated following the sea trials and were re-mated for delivery
 
 
 [35]
 Hulla's testimony relates to two separate points: first, that the specifications prescribed the percentage of contact necessary for the vessel to be safely mated on delivery and not simply the percentage of contact to be achieved before the sea trial, and second, that the improper mating caused the damage to the vessel and the sinking of the tug. We address the causation issue below
 
 
 [36]
 Although we held above that plaintiffs' negligence claims are not cognizable in maritime tort, the district court's findings on the issues of causation will be relevant to its determination of the foreseeability of damages stemming from Avondale's and Hvide's breaches of contract. Because the district court has not yet addressed this issue, we express no opinion as to the foreseeability of the events discussed in this section
 
 
 [37]
 The officials initially denied entry because the Oxy Producer's draft was too deep for the harbor, creating a risk that the vessel would run aground and spill its hazardous cargo in the harbor. The only berth deep enough for the Oxy Producer was at the NATO quay, and permission to berth there was denied because NATO vessels were expected to arrive at the port before the repairs on the Oxy Producer could have been completed
 
 
 [38]
 Avondale asserts that the district court erred in stating that the "norther" which exacerbated the poor weather conditions on the 20th was unforecast and also in stating that the storm reached the anchorage "just as the vessel weighed anchor." While there is testimony to the effect that the storm was forecast, the record is ambiguous as to when, precisely, these forecasts were made. It appears that the forecasts may not have been available until early in the morning of the 20th. Similarly, the record indicates that if the district court judge erred in his assessment of when the storm struck, he misstated the time by less than an hour. Thus, even if Avondale's assertions are correct, it appears that the Captain was confronted with rapidly changing weather conditions which would make the application of the in extremis doctrine all the more appropriate. We cannot conclude, then, that the district court erred, either in the legal standard that it applied to the Captain's conduct, or in its ultimate conclusion that Avondale failed to carry its burden of proving that the negligence of the Captain was an intervening cause in the sinking of the Oxy Producer
 
 
 [39]
 The experts suggested a number of alternatives, including declaring an emergency and requesting standby tugs, dropping two anchors instead of one, and going to sea but staying close to the shoreline. The experts disagreed among themselves, however, as to the relative merits of each of these options
 
 
 [40]
 The district court felt that the other experts discounted too readily the Captain's concern that the vessel could run aground and spill its hazardous cargo if it remained at anchor
 
 
 [41]
 We note that Avondale does not argue that Hvide actually directed Avondale to deviate from the plans and specifications. Rather, Avondale's contention is that by accepting the vessel when it was not mated in accordance with the plans and specifications, Hvide implicitly modified the plans and specifications
 
 
 [42]
 Section 2 of the Supervision Agreement provides:
 
 
 [2]
 Independent Contractor. The Supervisor shall perform all of the work specified in this Agreement as an independent contractor, and, except as expressly contained in this Agreement, nothing shall be deemed to constitute the Supervisor and/or its employees or consultants as the agents of the Owner for any purpose whatsoever. Except as expressly provided herein, the Supervisor shall have no authority to incur any obligations, contractual or otherwise, in the name of the Owner or for the account of the Owner
 
 
 [43]
 Avondale's argument is particularly weak in light of the district court's holding which indicates that the improper mating of the vessel did not stem from any conscious modification of the plans and specifications, but from Avondale's and Hvide's negligence in failing to insure that the plans and specifications were followed
 
 
 [44]
 Article III of the Construction Contract provides that the plans and specifications "are hereby made a part of this construction contract with the same force and effect as though herein set out in full."
 
 
 [45]
 Section 2-313(1)(a) of the U.C.C. provides that "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." 1 U.L.A. 311 (1976 & Supp.1988). We hold that the warranty of seaworthiness is an express warranty under either New York common law or the New York Uniform Commercial Code
 
 
 [46]
 The Tug Specifications provide that "[t]he builder shall be responsible for the construction, using good shipbuilding practices, of a complete and fully documented seaworthy vessel suitable and ready for the service intended in accordance with the requirements of these specifications."
 Similarly, the Barge Specifications provide that "[t]he intent and spirit of these specifications is that the contractor shall deliver the vessel in a seaworthy and safe condition and ready for service."
 In addition, both the Barge and Tug Specifications state that:
 Should there be any errors or omissions in these specifications or in the Contract Guidance Plans (listed herein) that would affect the construction of a complete and seaworthy vessel in accordance with good shipbuilding practice, the Contractor shall correct such errors as part of the Contract Work with no increase in the Contract Price.
 
 
 [47]
 Unless the district court's interpretation of a contract is based upon consideration of extrinsic evidence regarding, for example, the intent of the parties, the construction of a contract is a question of law and is not subject to the clearly erroneous rule. Strachan Shipping Co. v. Dresser Indus., Inc., 701 F.2d 483, 486 (5th Cir.1983)
 
 
 [48]
 A vessel may be "unseaworthy" when, among other things, it is not constructed so that it is fit for its voyage. In re Gulf & Midlands Barge Line, Inc. v. The Tug Ramrod, 509 F.2d 713, 721 (5th Cir.1975) (meaning of term in marine insurance contract)
 
 
 [49]
 Of course, a vessel may be considered unseaworthy due to any number of defects that are not sufficiently serious to cause the vessel to sink
 
 
 [50]
 The district court's interpretation of the guarantee deficiency clause as a one year warranty of workmanship and materials, independent of the warranty that the vessel would be seaworthy upon delivery, is not supported by the language of the contract. While the guarantee period begins upon delivery, the guarantee deficiency clause includes deficiencies that "appear or [are] discovered" during the guarantee period. This necessarily encompasses deficiencies which occurred before delivery but were not discovered until after delivery--including deficiencies that would have made the vessel unseaworthy on delivery
 
 
 [51]
 The guarantee deficiency clause is therefore similar to a warranty that the goods will be of the quality and kind described in the contract--that is, the vessel will be seaworthy upon delivery. A defect that is discovered after delivery would indicate that the product, when delivered, was not of the quality and kind described in the contract. Despite this temporal consideration, however, the buyer's remedies may still be limited by a one-year warranty to repair or replace defective parts or workmanship
 
 
 [52]
 The district court based its conclusion that the warranty of seaworthiness could not be subsumed in the guarantee deficiency clause in part on the concern that such an interpretation would compel the result that if a defective $1 bolt rendered the vessel unseaworthy and caused the vessel to sink, Avondale would have been obligated only to replace the $1 part
 
 
 [53]
 This ambiguity is problematic because the official comment to this section states that "[i]f the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract." U.C.C. Sec. 2-719 comment 1, 1A U.L.A. 494. Thus, if the contract is not governed by the U.C.C., it is not clear that the parties should be made, simply by force of analogy, to "accept the legal consequences" of making a contract subject to these particular code provisions
 On the other hand, the contract provisions at issue here are identical to those addressed in section 2-719.
 
 
 [54]
 This view is consistent with the purposes of section 2-719(2): "the subsection is not concerned with arrangements which were oppressive at their inception, but rather with the application of an arrangement to novel circumstances not contemplated by the parties." Eddy, supra, at 71 (quoting 1 State of New York Law Review Commission, Study of the Uniform Commercial Code 584 (1955))
 
 
 [55]
 The question whether circumstances caused the remedy to fail has been construed to mean whether circumstances changed so as to cause the remedy to fail. Computerized Radiological Services, 595 F.Supp. at 1510 (citing Wilson Trading Corp. v. David Ferguson Ltd., 23 N.Y.2d 398, 297 N.Y.S.2d 108, 244 N.E.2d 685 (1968)). Thus, if no conduct by the seller is alleged to have caused the circumstances to change, we must consider whether the circumstances contemplated by the contract have in fact changed so as to make the remedy ineffective, or whether the circumstances alleged to have caused the remedy to fail were anticipated by the contract
 
 
 [56]
 Finding that there was a genuine issue of material fact regarding the seller's efforts to comply with the exclusive remedy, the court did not decide whether the remedy had failed of its essential purpose. The court relied on the factors outlined above in holding that in the event that the remedy did fail of its essential purpose, the clause limiting the seller's liability to "the price of the equipment [or] part on which such liability is based" was still effective. 418 F.Supp. at 459
 The court went on, however, to construe this provision as allowing full recovery of the purchase price in the event that the generator as a unit could not or had not been repaired to comply with the contract specifications. This, they found, would constitute an adequate remedy in the event that the remedy of repair and replacement was found to have failed of its essential purpose.