705 So.2d 766 (1997)
Mitchell BURAS
v.
PETROLEUM HELICOPTERS, INC., et al.
No. 95-CA-1629.
Court of Appeal of Louisiana, Fourth Circuit.
December 17, 1997.
*767 Philip F. Cossich, Jr., Gregory W. Minton, Cossich & Associates, A Professional Corporation, Belle Chasse, and Michael X. St. Martin, St. Martin & Lirette, Houma, for Plaintiff/Appellant Mitchell Buras.
Kenneth H. Laborde, Leo R. McAloon, III, Gina S. Montgomery, Pulaski, Gieger & Laborde, New Orleans, for Defendant/Appellant Petroleum Helicopters, Inc.
Before CIACCIO, PLOTKIN and MURRAY, JJ.
MURRAY, Judge.
This case, involving injuries to an offshore worker as a result of a helicopter flight and "hard" landing on an oil platform, was tried to the court, which rendered judgment in favor of the plaintiff, Mitchell Buras in the amount of $874,018.55, and in favor of intervenor, Shell Pipeline Corporation, in the amount of $69,888.02. The judgment is appealed by the defendant, Petroleum Helicopters, Inc. (PHI), who assigns five errors by the trial court. Plaintiff has cross-appealed, arguing that the trial court erred when it applied general maritime rather than Louisiana law to his claim. We affirm.
The underlying facts are not in dispute. At approximately 3:00 p.m. on September 20, 1988, a Bell 206L-3 helicopter, owned by PHI and piloted by its employee, George Talley, took off from an offshore platform in Main Pass Block 151. The helicopter was carrying Mitchell Buras and Owen Barnes, two Shell employees, to another offshore platform at South Pass Block 65-A. Both platforms are located in the Gulf of Mexico, approximately 5-6 miles apart, so that the entire flight was over open water. The weather was clear and the seas were calm. The helicopter was equipped with flotation equipment that was designed to deploy in the event of a landing in the water. Mr. Buras, sitting in the right rear seat, and Mr. Barnes, sitting in the left front seat, were both wearing life vests as required by PHI regulations; the pilot, Mr. Talley, was not wearing his life vest as required, but it was within his reach. Shortly after taking off Mr. Barnes saw a small bird pass under the rotor disc of the helicopter and into its turbine engine. Although the witnesses disagree how long after take-off this incident happened, all agreed that it was followed immediately by a loud, *768 high-pitched squealing noise, and a rise in the T(urbine)O(out)T(emperature) gauge. The pilot immediately cut power to the engine and notified his base in Venice that he had a problem. He communicated with his dispatcher several times, at one point indicating that the passengers had seen smoke, and finally advising that he did not think that he was going to make it to the next platform and might have to make an emergency landing in the water.
All three of the witnesses, the pilot and his passengers, described the scene in the helicopter as frantic. Mr. Barnes said that he smelled smoke, and he heard Mr. Talley discuss the presence of smoke with the PHI dispatcher. Mr. Talley testified that everything, the bird strike, the engine overheating, the noise and his decision to cut power and continue on to the platform, was happening "in a heartbeat." All three men described a high-pitched, screaming noise coming from the engine. Mr. Barnes stated that the noise was so loud, he could not hear himself. Mr. Buras and Mr. Barnes each testified that he feared for his life. Mr. Barnes was hyperventilating. He testified that he watched the temperature gauge go higher and higher, which he knew to be dangerous. Mr. Buras was in a state of panic. Both pleaded with the pilot to land the plane immediately. Mr. Barnes heard Mr. Talley tell the PHI dispatcher that he did not think they would make it. Mr. Talley succeeded in reaching the platform at South Pass, and was able to land the helicopter. While the three witnesses differed slightly in describing the landing, all agreed that it was not normal. Mr. Talley, the pilot, testified that the helicopter came into the platform with forward speed at a 45 degree angle rather than from its usual hover. It skidded approximately two feet upon impact with the deck, but bumped less than some normal landings he has experienced. Mr. Barnes testified that he thought the helicopter came into the platform at a high rate of speed. He said that it was at a 45 degree angle when it hit the deck, with the back of its skids hitting first, and skidded about three feet before it stopped. He testified that the engine quit almost as soon as they landed. Similarly, Mr. Buras testified that the helicopter came in very fast, hit on the back skids and slid forward. Mr. Buras alleged that he was thrown forward upon landing, and injured his back as a result. He also alleged that he has suffered severe emotional distress, and that he is disabled as a result of these physical and mental injuries. This litigation followed.
The threshold question presented by this appeal is the determination of what law is applicable to a case involving injury to a helicopter passenger in a "hard" landing on a platform located on the Outer Continental Shelf following damage to the helicopter as a result of a bird "strike" shortly after takeoff over open water. The trial court, relying on Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986), determined that the case was governed by the general maritime law.
Plaintiff's counsel argues that the trial court erred when it concluded that Offshore Logistics required the application of maritime law to Mr. Buras' claim. Plaintiff distinguishes that case from his because it dealt with a crash that occurred 35 miles offshore with no drilling platforms in the vicinity so that the maritime locality requirement for admiralty jurisdiction was satisfied. Although Mr. Buras concedes that the activity of ferrying passengers from one piece of land[1] to another is a function traditionally performed by waterborne vessels so that there is a maritime nexus, he argues that his claim is not governed by maritime law because it does not involve a maritime locality, the other prerequisite to a finding that a claim is a maritime tort. Mr. Buras contends that the effect of Mr. Talley's negligence occurred not on water, but on the platform when the helicopter made the "hard" landing that caused his injuries, so that his claim is governed by Louisiana law, pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C.A. § 1331, et seq., which provides for the application of state law, as *769 surrogate federal law, to accidents and injuries occurring on platforms on the Outer Continental Shelf.
PHI counters that the maritime locality requirement is met in this case because the pilot's decision was made and the effect of that decision took place over navigable waters.
In 1972 the Supreme Court addressed the question of whether maritime law would apply to claims arising from the crash of an airplane in navigable waters shortly after take-off. The plane, which was on a charter flight from one point within the continental United States to another, crashed after it struck a flock of seagulls as it was taking off. Executive Jet Aviation v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). As in this case, the parties in Executive Jet disagreed as to where the negligence occurred. The party seeking to apply maritime law argued that the substance and the consummation of the negligence occurred in navigable water, where the plane crashed. The party opposing the application of maritime law argued that the negligence took effect over land, where the plane collided with the birds. The Court noted that accepting either position "gives rise to the problems inherent in applying the strict locality test of admiralty tort jurisdiction in aviation accident cases." Id. at 267, 93 S.Ct. at 504. The Court concluded that "[T]he mere fact that the alleged wrong `occurs' or `is located' on or over navigable waters whatever that means in an aviation context is not of itself sufficient to turn an airplane negligence case into a `maritime tort.'" Id. For this reason, it held that unless the wrong alleged bore a significant relationship to a traditional maritime activity, claims arising from airplane accidents are not cognizable in admiralty. Id. Following Executive Jet, the application of maritime law to a tort claim has required both a maritime locality and a maritime nexus.
The element in dispute here, unlike that in most cases, is the maritime locality. Although, each side makes a persuasive argument for its position, the rationale of Executive Jet compels us to conclude that the trial court correctly determined that Mr. Buras' claim is governed by maritime law. The incident that started the series of events that led to Mr. Buras' claim began over navigable waters while PHI's employee was ferrying his passengers from one artificial island to another, an activity that all parties agree bears a significant relationship to a traditional maritime activity. The negligence of which Mr. Buras complains, the failure of the pilot to put the plane down as soon as it experienced a power loss, occurred over navigable water shortly after take-off, and continued until the helicopter landed. A major component of Mr. Buras' injuries relate to the emotional trauma of that flight. Although it is true that he suffered an additional physical injury when the helicopter made its hard landing, we find that the facts of this case satisfy the maritime locality requirement for the application of maritime law.
Because we find that the trial court's application of maritime law to Mr. Buras' claim was proper, we also find that the trial court did not err when it used after-tax income in calculating Mr. Buras's past and future wage loss.
We now address the errors alleged by PHI. Although PHI agrees that the trial court correctly determined that Mr. Buras' claim is governed by maritime law it contends that the court did not correctly apply that law to this case. Specifically, PHI argues that it was held to a very high standard of care based on the court's erroneous determination that it is a common carrier. PHI also contends that the trial court failed to consider the emergency nature of the situation in determining that it had breached the standard of care.
Plaintiff counters by arguing that PHI has mischaracterized the trial court's decision as being predicated upon legal error in an effort to avoid the manifest error standard of review that he contends is applicable to this case.
We find that the trial court's determination that PHI breached its duty of care to Mr. Buras is correct. The trial court issued twenty-six pages of detailed, comprehensive reasons for the judgment it rendered. In considering the question of PHI's status as a *770 common or private carrier, the court noted that the evidence on that issue was contradictory. Although the court stated that it considered PHI to be a common carrier, owing a high degree of care to its passengers, it concluded that "PHI has violated even an ordinary duty or standard of care owed to its passengers in this case."[2] In making that determination, the court analyzed the facts of the case in light of PHI's duty to its passengers to operate its helicopters in a reasonably prudent manner and to take all steps necessary for the protection of those passengers. Finding that the harm complained of by Mr. Buras was within the scope of the protection afforded by that duty, the court utilized a "duty-risk" analysis in order to determine if PHI had breached its duty. Applying the four factors of the "duty-risk" analysis to the facts of this case the court concluded that the activity in which PHI was engaged was of great social utility. However, because the likelihood and gravity of harm that may result from improperly conducting that activity also is great, the court reasoned that the burden of prevention, the final factor of the "duty-risk" analysis, was pivotal to the determination of whether PHI had breached its duty to Mr. Buras.[3]
In determining the burden of preventing the forced landing on the platform, the court was called upon to resolve conflicting testimony and to draw inferences from the evidence presented. The court conducted a detailed analysis of the evidence and concluded that a water landing was a reasonable means of preventing this accident, under the circumstances of this case. We review this conclusion in order to determine if it is clearly erroneous. Maranto v. Goodyear Tire & Rubber Co., 94-2603, 94-2615, p. 7 (La.2/20/95), 650 So.2d 757, 762.
There is no dispute that the helicopter was equipped with flotation devices that were designed to allow it to be landed on the water, and that the weather was clear and the seas calm. There is no dispute that the bird strike created a very serious situation that resulted in immediate overheating of the engine.
Mr. Talley testified that the weather was clear and the sea was calm, but with a "run in ground swell." He explained that this meant there was no wave or wind chop, but that the sea was not "smooth as glass." He also testified that he immediately knew that something had gone wrong. He acknowledged that the plane was not operating normally, and that he considered it an emergency situation. He conceded that the situation was one that required a precautionary landing.
In Mr. Talley's words "The aircraft was airworthy to fly it to a good place to make a precautionary landing." He felt that the South Pass platform was the closest "suitable" spot for such a landing. Mr. Talley testified that he did not land from a hover, as was the usual procedure. Rather, he reduced power to 72% torque in order to keep the TOT in the "green" range so as to avoid burning up the engine, and then applied more power as he approached the platform.
Although Mr. Talley's experience had demonstrated that a helicopter equipped with flotation devices will float upright on calm seas, he considered a water landing to be a last resort because of his fear that someone would be injured getting into the rescue boat. He testified that he always had the option to land in the water if the engine quit. Mr. Talley admitted that he had no way of knowing the extent of the damage caused by the "bird strike." He acknowledged that he knew that he might be forced to land the helicopter in the water before he reached the platform. In fact, at one point, he advised his dispatcher that he did not think they were going to make it.
Mr. Talley testified that he based his decision to continue to South Pass 65 rather than land in the Gulf, at least in part, on his experience in Viet Nam. He described having flown an aircraft that had been shot and was making a high-pitched squealing noise, similar to that heard after the bird strike, forty miles before he could find a safe landing area.
*771 The experts disagreed as to whether the pilot's decision not to make a immediate water landing was a reasonable one. Mr. Walter Lamon, an expert called by PHI and qualified in the field of helicopter piloting and safety offered his opinion that Mr. Talley did nothing wrong in deciding to continue to the South Pass platform. He suggested that this was the only practical landing area, noting that the pilot always had the option of a water landing while he continued on to the platform. On cross-examination Mr. Lamon admitted that the helicopter was not airworthy from the time it ingested the bird.
Mr. Michael Haynes, an expert called by Mr. Buras and qualified in the field of safe helicopter operations and piloting offered his opinion that the pilot should have made a precautionary landing in the water. Mr. Haynes based this opinion on the fact that a landing in the water would have been a "powered" landing as opposed to a "forced" landing on the platform. Mr. Haynes testified that the PHI manual required that a precautionary landing be made immediately, and that Mr. Talley took a "calculated risk" by continuing to the platform. Finally, Mr. Haynes testified that the noise made by the engine, as described by the witnesses, indicated that there was structural damage to the engine, which could have failed at any time.
The trial court found that "[t]he conclusion to be drawn is that a water landing could have been performed with much more power and more safely than the landing performed on the platform."[4] The trial court recognized that there were dangers inherent in either of the options available to Mr. Talley. It found, however, that the course chosen by Mr. Talley presented more "unknowns."
While counsel for PHI emphasizes the discretion given to a pilot in an emergency situation such as this, plaintiff's counsel argues that the situation did not become an emergency until Mr. Talley elected to continue to fly after the "bird strike" had disabled his plane.
Because Mr. Talley's gamble paid off we know the result of the course he chose. Although the helicopter did not make a normal landing on the platform, it, fortunately, did not crash and burn as Mr. Buras feared it would. However, the determination of whether Mr. Talley's actions were reasonable under all the circumstances must be made in light of those circumstances as they were presented at the timenot with 20-20 hindsight.
Immediately upon striking the bird the turbine temperature began to rise, air flow was restricted; the engine was not operating properly; the helicopter was not airworthy. This was a serious problem, which all the experts agree required a precautionary landing. The dispute here focuses on what was a suitable precautionary landing: an immediate powered landing on calm seas or a forced landing on a platform 1 1/2 to 4 miles away.
The helicopter was equipped with very expensive flotation equipment designed for emergency landings on the water. In Mr. Talley's experience, a helicopter so equipped will float upright on calm seas. The weather was clear, and the helicopter was equipped with an inflatable raft. There were two nearby platforms from which rescue boats could have been dispatched so that the passengers would not have been in the water for very long before being picked up. Although Mr. Talley was concerned that someone might be hurt in transferring to the rescue boat, that risk under these weather and sea conditions seems minimal.
By contrast, Mr. Talley was forced to reduce power to 72% torque in order to keep the TOT within the "green" range to be able to continue to the platform. However, it was necessary for him to apply more power as he made his approach; this caused the engine temperature to rise, and increased the risk that the engine would fail, perhaps at a critical point. Mr. Talley did not know the extent of the damage to his plane from the bird strike. Although he felt that he had the situation under control, his engine could have quit at any time. Mr. Talley admitted as much when he justified his decision to continue *772 to the platform by stating that he "always had the option of a water landing."
Based on these facts, we cannot say that the trial court was manifestly erroneous when it determined that Mr. Talley's actions were not reasonable under the circumstances. The decision to continue flying, which was a reasonable one when the problem occurred over enemy territory in Viet Nam where there was no viable alternative, was not reasonable under the conditions existing in the Gulf of Mexico on September 20, 1988. The record supports the trial court's decision that PHI breached the standard of reasonable care under the circumstances that it owed to its passengers when its pilot elected not to make a precautionary landing in the water. We find, therefore, that the first and second errors assigned by PHI are without merit.
In its third assignment of error PHI contends that Mr. Buras failed to carry his burden to show that Mr. Talley's negligence was the cause in fact of his injuries. It also contends that the trial court erred in determining that Mr. Buras was permanently disabled from employment as a result of Mr. Talley's negligence.
PHI suggests that plaintiff has not borne his burden as to causation because he has not shown that he would not have been injured were it not for Mr. Talley's negligence. It argues that the stress and trauma Mr. Buras experienced were related to the bird strike and the engine noise that followed it. Because this trauma is unrelated to Mr. Talley's decision as to where to land, PHI suggests that a water landing would have created even greater potential for developing post-traumatic stress disorder.
Plaintiff counters that the evidence establishes that Mr. Buras was a good worker, who suffered no mental or physical problems immediately preceding the accident, but who began experiencing back and psychological problems thereafter. Plaintiff argues that this evidence creates a presumption that his back and emotional problems were caused by the accident, and that the trial court correctly concluded that PHI had not produced sufficient evidence to rebut that presumption.
The determination of whether a particular accident caused a person's injuries is a question of fact that is reviewed under the manifest error standard. Maranto, 94-2603, 94-2615 at p. 7, 650 So.2d at 762.
The trial court concluded that a water landing would have been a controlled soft landing. We have reviewed the evidence and found that it supports that conclusion. Based on the evidence, the trial court's determination that Mr. Talley's negligence was a cause in fact of Mr. Buras' emotional and physical injury is supported by the record. PHI's third assignment of error is without merit.
PHI next takes issue with the trial court's conclusion that Mr. Buras' physical and emotional injuries render him completely disabled. PHI argues that Mr. Buras could not be disabled from his back injury because he returned to work after the accident, working for a month during which he did not miss a single day, and another month in which he missed only one week. It also argues that there is absolutely no evidence to establish that Mr. Buras' psychological injury, which it suggests is highly suspect, makes it impossible for him to work.
The evidence establishes that Mr. Buras suffered a fall at a grocery in October of 1986, and that he was out of work until March of 1987 as a result of that accident. However, he testified that the injuries that he suffered in that fall had resolved prior to the "hard" landing on the platform at South Pass. He also testified that he experienced back pain and emotional distress after the landing, and consulted Dr. Alden Baehr, his family physician, for both problems. On November 29, 1988, Dr. Baehr referred Mr. Buras to Dr. Kleinschmidt, an orthopedist.
Dr. Raeburn C. Llewellyn, a neurosurgeon, treated Mr. Buras following his accidents in 1986 and 1988. He explained that he first saw Mr. Buras on November 3, 1986. At that time diagnostic testing revealed the presence of spondylolisthesis, a congenital abnormality, at the level of L3-4 as well as a bulging of the L3-4 disc. Dr. Llewellyn diagnosed a muscle ligament sprain of the low back, perhaps with damage to the L3-4 *773 disc, and recommended six weeks of out-patient physical therapy and supportive medications. He discharged Mr. Buras to return to work on March 10, 1987.
Dr. Llewellyn did not hear from Mr. Buras again until May 17, 1989, when he returned complaining of low back pain as well as pain radiating into his legs following a helicopter accident. Dr. Llewellyn was concerned that Mr. Buras' complaints had not resolved despite appropriate orthopedic treatment, physical therapy and neuropsychiatric treatment. He felt that diagnostic testing was necessary, but deferred this because of Mr. Buras' psychiatric condition. Because of that condition, the diagnostic testing was not performed until June 26, 1991, when nerve testing of the lower extremities indicated that the L5-S1 nerve was damaged. A myelogram/CAT scan revealed a defect at L3-4 and a bulging at L4-5. Mr. Buras underwent a neurosurgical procedure on June 27, 1991, which involved the removal of the L3-4 disc, to decompress the nerves. Dr. Llewellyn, who continued to treat Mr. Buras after surgery, opined that he is permanently and totally disabled from full, unlimited work, and doubted that he could do even light work so that he could not return to any form of manual labor.
Dr. Mark Juneau, an orthopedic surgeon called by the defense, testified that he found no indication for surgery when he was treating Mr. Buras after the helicopter accident. However, he acknowledged that he had not seen the reports of the diagnostic tests ordered by Dr. Llewellyn. It is Dr. Juneau's opinion that Mr. Buras has a 30% permanent impairment of his low back as a result of the laminectomy and that he is not a candidate to work in the heavy labor force.
Dr. Candace Cutrone, the psychiatrist who has treated Mr. Buras since 1989, testified that he suffers from post-traumatic stress disorder as a result of the helicopter incident in September 1988. Dr. Cutrone explained that Mr. Buras initially was treated for this condition by Dr. LeMay, her associate, in late 1988. She began treating Mr. Buras after Dr. LeMay's death. It is her opinion, based on testing, that Mr. Buras is of low average intelligence with a limited ability to think abstractly. Because of this his recovery is much more problematic. Mr. Buras has been hospitalized six or seven times since the accident because of an exacerbation of his symptoms. In between hospitalizations he has been treated with medication and supportive intervention. Dr. Cutrone continued to treat Mr. Buras as of the time of trial, and had no immediate plan to discharge him. It is her opinion that he will need some degree of psychiatric treatment indefinitely.
Dr. Cutrone was cross-examined about Mr. Buras' prior history of emotional problems, including a hospital admission for alcohol abuse and his treatment with anti-depressive and anti-anxiety medication prior to the helicopter incident. It is her opinion that drinking was not involved in the hospital admissions that followed the helicopter accident. She has diagnosed Mr. Buras as having post-traumatic stress disorder (PTSD). Dr. Cutrone explained that there were times when Mr. Buras' post-traumatic stress disorder was overlapped by and may have exacerbated a depressive disorder, but that PTSD is a separate psychiatric condition from a depressive disorder. Although Dr. Cutrone felt that Mr. Buras could function in a work environment during those periods when his symptoms were in remission, she had found him to be largely unstable.
Dr. Rennie Culver, who was qualified as an expert in psychiatry, testified on behalf of PHI. He explained that he examined Mr. Buras for approximately one and one-half hours on March 27, 1989, at the request of an employee of Shell Oil. Dr. Culver opined that Mr. Buras was of below-average intelligence, based on his clinical examination. He also testified that, in his opinion, Mr. Buras was exaggerating his psychiatric complaints related to the helicopter accident. Finally, he disagreed with the diagnosis of post-traumatic stress disorder because he felt that the incident described by Mr. Buras would not produce post-traumatic stress. Dr. Culver explained that he would expect the helicopter incident to produce transient or situational anxiety. However, it is his opinion that the diagnosis of PTSD can apply only to people who have had an experience that is greatly outside the range of usual human experience. *774 On cross-examination he admitted that he had no specifics with regard to the helicopter accident except the description provided by Mr. Buras.
Where the testimony of expert witnesses differ, the trier of fact must determine which evidence is the most credible. Mistich v. Volkswagen of Germany, Inc., 95-0939, p. 5 (La.1/29/96), 666 So.2d 1073, 1077, reh'g granted, opinion reinstated on reh'g, 95-0939 (La.11/25/96), 682 So.2d 239. Resolution of discrepancies in testimony is within the vast discretion of the trier of fact, and such resolutions will not be upset absent manifest error. Young v. Logue, 94-0585, p. 38 (La.App. 4 Cir. 5/16/95), 660 So.2d 32, 57, writs denied, 95-2575, 95-2585, 95-2597 (La.12/15/95), 664 So.2d 443-444. Further, this circuit has established that a trier of fact is entitled to place greater weight on the testimony of a treating physician than those of other physicians who have treated the plaintiff only for purposes related to the litigation. Id.; Pereira v. Louisiana Coca-Cola Bottling Co., 620 So.2d 315 (La.App. 4 Cir.), writ denied, 629 So.2d 414 (La.1993).
The evidence of record establishes that Mr. Buras is of very limited intelligence, with an unstable back and severe emotional problems and supports the trial court's determination of disability. Therefore, we cannot say that the conclusion that Mr. Buras is totally and permanently disabled as a result of his back injury and post-traumatic stress disorder is manifestly erroneous.
Finally, PHI contends that the trial court erred when it failed to reduce Mr. Buras' damages, arguing that his pre-existing conditions required such a reduction. It is uncontested that Mr. Buras had suffered a previous back injury that required treatment and emotional problems that required hospitalization prior to this accident. However, he made a full recovery from his back injury in 1986, and was able to perform his job duties without problem until the helicopter accident. Likewise, although he required psychiatric treatment prior to the helicopter incident, Mr. Buras was able to function. In addition, his treating psychiatrist diagnosed him as suffering from post-traumatic stress disorder, a separate psychiatric condition from the condition that caused him to seek treatment before this accident.
While Mr. Buras' pre-existing conditions probably made him more susceptible to both physical and mental injury than the average person, that does not relieve or reduce PHI's responsibility for the injuries caused by its conduct. Aisole v. Dean, 574 So.2d 1248, 1253 (La.1991). For this reason, we find no merit in PHI's final assignment of error.
The judgment of the trial court is affirmed, with each party to bear its own cost on appeal.
AFFIRMED.
PLOTKIN, J., dissents with written reasons.
PLOTKIN, Judge, dissenting with written reasons:
Because I believe that the actions of the pilot, George Talley, were reasonable under the emergency circumstances which gave rise to this case, I respectfully dissent.
Talley, a professional licensed pilot, operating a non-defective helicopter in a non-negligent manner was suddenly confronted with an emergency situation when a bird was ingested into the engine.
The duty of a vessel pilot faced with an emergency situation, under maritime law, has been described as follows:
The master of a vessel caught in an emergency where he is forced to choose between risky alternatives, is entitled to a wide range of discretion in deciding what to do, provided it is a reasonable exercise of current standards of nautical knowledge and skill under the circumstances. It does not become negligence because the decision he makes may later, in the light of subsequent events revealed through hindsight, be shown to have been wrong.
Employers Insurance v. Suwannee River Spa Lines, Inc., 866 F.2d 752, 772 (5th Cir. 1989), quoting Esso Standard Oil S.A. v. S.S. Gasbras Sul, 387 F.2d 573, 580 (2d Cir.1967).
Although both the trial court and the majority recognized that the proper standard of care applicable to the pilot in this case was *775 reasonableness under the circumstances, both misapplied the standard by focusing almost exclusively on whether it would have been more reasonable for Mr. Talley to have immediately make a "soft landing" in the water rather than continuing to fly to the platform. Whether another option was more reasonable is not the appropriate question; rather, the issue is whether the option chosen, in light of all the circumstances surrounding the emergency, was reasonable.
The majority's error is evidenced by the fact that a large portion of the analysis on this issue is focused on a discussion of whether the helicopter was properly equipped for a water landing, and whether Talley had experience making water landings. Neither of those issues has any bearing on whether the decision Talley did makei.e., to fly to the platformwas reasonable under all the circumstances. The facts that the helicopter was equipped with "expensive flotation equipment" and that Talley had make previous successful water landings are relevant only to the extent that the presence of another optioni.e., the "soft" water landingis one of many different circumstances to be considered.
Concerning the only relevant issue whether Talley's decision to continue flying to the platform was reasonable, the record evidence indicates that Talley had previously flown a helicopter with a similar malfunction for approximately 40 miles. Moreover, at least one expert agreed with Talley's estimate that the platform was the "only practical landing area" available, especially in light of the fact that Talley could have changed his mind at any time and decided to make a water landing. Moreover, the fact that another expert testified that Talley took a "calculated risk" in flying to the platform is not conclusive since other evidence indicated that making a water landing would also have been a "calculated risk," given the uncertainties attendant to that option, even on a calm sea.
In finding that the ship's captain did not violate the above-quoted standard of care in Employers Insurance, 866 F.2d 752, the court stated as follows:
First, there is ample evidence that Captain Kanellos carefully considered his options (none of which could be guaranteed to succeed) and made a conscious decision that the risk of dragging anchor, running aground, and spilling the vessel's hazardous cargo outweighed the risk of attempting to maneuver the vessel away from the breakwater. Second, the experts who testified at trial did not agree on one prudent course of action. Finally, at least one expert agreed with Captain Kanellos that remaining at anchor could have been dangerous. The district court found that the expert testimony established, at most, that another course of action might have been successful and that this was not enough to establish that the captain's actions had been unreasonable under the circumstances. We agree. "The standard of judging the exercise of prudent seamanship here was tempered by the requirement for decision under very difficult, abnormal circumstances and the error, if there was error, was not negligence."
Id. at 772, quoting M.P. Howlett Inc. v. Tug Michael Moran, 425 F.2d 619, 623 (2d Cir.), cert. denied, 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970).
The evidence in the instant case leads me to similar conclusions. First, the evidence establishes that Talley carefully considered the two available options, and that his choice of options was based on his understanding of the totality of the circumstances, reviewed in light of his training and experience. Certainly, the trial court's finding that Talley's decision was based on a greater concern for himself and for his employers' property than for the safety of his passengers is not supported by the record. Neither of the options available to Talley were guaranteed to succeed. His decision to continue flying to the platform rather than make a water landing was based on a conscious decision that the risk of attempting a water landing, with the attendant possibilities of injury to the passengers, outweighed the risk of flying to the platform.
Moreover, as the majority notes, the experts testifying at trial expressed different opinions on the more prudent course of action; *776 at least one of the experts agreed with Talley that making a water landing would have been even more dangerous than flying to the platform. The other expert testimony established, at most, that the other option might have been more successful. That testimony is simply insufficient to establish that Talley's choice was not reasonable under the circumstances. Like the captain in Employers Insurance, 866 F.2d 752, Talley considered all the options and made a decision in the midst of "very difficult, abnormal circumstances"; "the error, if there was error, was not negligence." Id. at 772.
I see the standard of care to be applied here as roughly analogous to the "error of judgment" rule used in legal and medical malpractice cases to determine negligence. Under the "error of judgment" rule, a legal or medical professional who follows applicable recognized professional standards in recommending a particular course of care cannot be held liable simply because it is later discovered that another decision would have been better. Pilots, like legal and medical professionals, are required to satisfy specialized training and licensing requirements. Like a lawyer or doctor, a pilot who makes a choice between two reasonable courses of action, so long as he reasonably exercises current standards of nautical knowledge and skill under the circumstances, may not be held liable for failing to take the other reasonable course.
The record evidence in the instant case, taken as a whole, indicates that Talley's decision to continue flying the helicopter to the platform was reasonable under the circumstances. Of course, the evidence also indicates that making a water landing would have been reasonable under the circumstances. Talley simply made a choice between two reasonable alternatives. Under the applicable standard of care, which allows a pilot in Talley's situation great discretion, neither Talley nor PHI was guilty of negligence.
I question the role of the experts concerning the determination of ultimate facts in the instant case. This case does not involve allegations that the defendant breached a statute or violated a duty of care; negligence was not an issue. In fact, the allegations in this case raise issues roughly analogous to "sudden emergency" doctrine issues. See Marigny v. Allstate Insurance Co., 95-0952 (La. App. 4 Cir. 1/31/96), 667 So.2d 1229, writ denied, 96-0693 (La. 4/26/96), 672 So.2d 910. As I have said repeatedly, the only proper question was whether the choice made by the pilot was reasonable under the circumstances. Nevertheless, the trial court made a decision, in a bench trial, based on his evaluation of the relative merits of the competing expert testimony concerning an issue which was actually irrelevant to the real question presented by this appeal. The trial court's decision was obviously based on his conclusion that the plaintiff's experts' opinion that a water landing was a better option was correct. The majority affirms, based on the manifest error standard. Although expert testimony is obviously helpful in evaluating the reasonableness of the pilot's actions in this case, the trial court's decision to credit the testimony of one set of experts over the testimony of the other, it seems to me, is not entitled to affirmation simply because the majority finds no manifest error. A layman is just as qualified as the experts to determine whether the pilot's actions were reasonable in the instant case. The trial court's decision was based on consideration of improper issues. I believe that the majority's deference to the trial court's decision was unwarranted under the unique circumstances of this case.
Accordingly, I would reverse the trial court judgment holding PHI liable for Buras' injuries and vacate the damage award.
NOTES
[1] The oil platforms located on the Outer Continental Shelf have been recognized as artificial islands for purpose of the Outer Continental Shelf Lands Act. Offshore Logistics, 477 U.S. at 217, 106 S.Ct. at 2491.
[2] Reasons for Judgment, p. 12.
[3] Reasons for Judgment, p. 8.
[4] Reasons for Judgment, p. 9.