Larry **ENNES**, et al.

v.

**COTTRELL, INC.,** et al.

No. CIV.A.98–0681.

United States District Court, W.D. Louisiana, Shreveport Division.

June 16, 1999.

Leroy H. Scott, Jr., Shreveport, LA, Brian M. Wendler, Wendler & Ezra, Glen Carbon, IL, for Larry Ennes, Beverly Ennes, plaintiffs.

S. Maurice Hicks, Jr., Hicks Hubley & Marcotte, Shreveport, LA, William D. Howard, Strain Murphy & VanderWal,

Grand Rapides, MI, Jay P Adams, Hudson Potts et al., Monroe, LA, Paul L. Wickens, Foland & Wickens, Kansas City, MO, for Cottrell Inc, General Motors Corp., defendants.

## MEMORANDUM RULING

PAYNE, United States Magistrate Judge.

### Introduction

Before the court is a Motion for Summary Judgment (Doc. 64) filed by General Motors Corporation ("GM"). Both GM and the Plaintiff have submitted depositions, discovery responses and other documentation in their efforts to satisfy their respective burdens under *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) and its progeny. The court has reviewed the facts set forth in those documents in the light most favorable to the plaintiff and has drawn all reasonable inferences in his favor. *Brothers v. Klevenhagen*, 28 F.3d 452, 455 (5th Cir.1994). The facts thus presented show that there are genuine issues of material fact that require, for the reasons that follow, that the motion be denied.[1]

### Background Facts

Larry Ennes ("Plaintiff") worked for Jack Cooper Transport as the driver of a truck and trailer unit that is designed to haul automobiles. Most, but not all, of the automobiles hauled by Plaintiff were GM products. The automobiles are secured to the transport unit with chains that are tightened with a ratchet device that the driver operates with a 34″ long tie-down bar. Plaintiff was tightening down the system around a S–10 truck manufactured by GM when sudden slackening in the chain caused him to suffer a back injury. The automobiles that Plaintiff was loading at the time of the accident included GM and Ford products.

Plaintiff and his wife sued the manufacturer of the trailer, Cottrell, Inc. ("Cottrell"), under theories of negligence and product liability. They also sued GM under a negligence theory. After several months of proceedings, GM filed this motion which argues that: (1) GM cannot be liable under the Louisiana Products Liability Act ("LPLA") because it is not the manufacturer or seller of the ratchet tie-down system; (2) GM did not owe a duty to Plaintiff; and (3) if GM does have a duty, it does not extend to Plaintiff. The motion also attacks a prayer in the complaint for punitive damages, but Plaintiff concedes in footnote 1 of his memorandum in opposition that Louisiana law does not permit the award of punitive damages in this case.

### The LPLA Issues

■ Plaintiff's complaint pleads separate counts against GM and Cottrell and directs specific legal theories at each. It plainly does not allege a claim against GM under the LPLA. Nonetheless, GM argued in its motion that Plaintiff had no such claim. Once GM set up this straw man Plaintiff, naturally, attempted to keep it standing. Even if Plaintiff's complaint were read to plead an LPLA claim, and it is not, it can not survive summary judgment.

The LPLA "establishes the exclusive theories of liability for manufacturers for damage caused by their products." La. R.S. 9:2800.52 A "manufacturer" means "a person or entity who is in the business of manufacturing a product for placement into trade or commerce." § 2800.53(1) Plaintiff argues that GM was a manufacturer of the ratchet tie-down system because "manufacturing a product" includes "producing, making, fabricating, constructing, *designing*, remanufacturing, reconditioning or refurbishing a product." *Id.*, (emphasis added). To support his claim that GM designed the ratchet tie-down

---

1. All facts recited herein are based on the current record and the rules applicable to summary judgment. They are not findings of fact and are not in any way dispositive of any factual dispute.

system, Plaintiff points to evidence that GM specified the type of tie-down system to be used on trailers that hauled GM products, that GM was involved in creating industry standards relating to tie-down systems, and that GM was otherwise involved in setting standards for the systems used to haul its automobiles.

It is uncontested that the ratchet system at issue was first designed and production began more than fifty years ago. After the product had been designed and placed into commerce and use, it became an industry standard. In the early 1980's GM and the carriers and manufacturers of hauling equipment formed what the parties refer to as the Haulaway Committee. GM offers testimony to the effect that the committee was intended to facilitate the exchange of ideas on how damage to GM vehicles could be decreased or minimized. Sometime in the 1980's, several decades after the ratchet system was introduced, GM required that its haulers use a ratchet that had been formed by investment casting of the steel rather than the older form of sand casting.

In 1985 the Haulaway Committee formed a securement subcommittee, first headed by Elwood Feldman, a Cottrell executive. During the late 80's and early 90's, a trailer subcommittee also discussed many of the same subjects as the securement subcommittee. These various bodies, which included GM representatives, reviewed and discussed a number of alternative mechanisms for securing the cars. Several alternatives such as the use of straps, a gear reduction device, and hydraulic or pneumatic tie-down systems were rejected by GM. GM desired to find a method that reduced damage to its automobiles. The alternatives that did not use chains may have helped in that regard, but GM was apparently concerned that the mechanical advantage afforded by those methods could also cause damage if the drivers applied too much force during application.

GM's Vehicle Shipping Manual (Plaintiff's Memorandum in Opposition, Exhibit 11) contains detailed instructions on how to secure and haul GM cars. The portions of the manual presented to the court appear to assume the use of a ratchet mechanism to tighten chains to secure the cars, but the manual does not specify any particular model, style, or brand of ratchet. It does require that the ratchet head be an investment casting SAE 8620 steel, that the pawl be forged from SAE 1035–1040 steel, and that the tip be ground to match the gear. The ratchet and pawl are to be mounted on a prefabricated bracket. *See* page II–7. The manual also expressly and emphatically prohibits the use of hydraulics to tighten chains and limits the length of the tie-down bar to 34″. *See* p. II–5.

The court finds, as a matter of law, that GM is not a manufacturer of the ratchet mechanism within the meaning of the LPLA. The relevant aspects of the design were put into place decades before the Haulaway Committee was formed. To the extent that GM has required that the metal be of a certain casting, Plaintiff does not contend that his injury was caused by that aspect of the design. Furthermore, GM and other persons do not, by merely insisting that those who do business with them employ equipment that meets certain standards, become manufacturers of that equipment for product liability purposes. A contrary holding would not be consistent with the language or spirit of the LPLA.

**Negligence**

 Having found that the LPLA is inapplicable to GM in this case, the court turns to basic principles of negligence. In Louisiana, negligence is examined under a duty/risk analysis. The duty/risk analysis consists of four parts: (1) cause-in-fact, (2) existence of a duty, (3) breach of duty, and (4) whether the risk, and harm caused, was within the scope of protection afforded by the duty breached. *Roberts v. Benoit,* 605 So.2d 1032, 1043 (La.1991). GM focuses its motion on the duty and scope elements.

■ The existence of a duty is a question of law. *Mundy v. Department of Health and Human Resources*, 620 So.2d 811, 813 (La.1993); *Roberts, supra.* All persons have a general duty to act in a reasonable fashion so as to avoid harming others. La. Civ.Code art. 2316 ("Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill.") More specific duties that govern particular situations and relationships are also imposed by the legislature and the courts based on policy and other reasons. Plaintiff does not invoke any specific duty or even particularly address this issue before jumping to the scope of the risk issue. Accordingly, the court will assume that GM is to be judged only on the basis of our shared duty to act in a reasonable fashion so as to avoid harming others.

■ Courts often combine the discussions of whether a specific duty exists and whether the duty (general or specific) extends to protect a particular plaintiff from the particular harm at issue. *See Hill v. Lundin, & Assocs.*, 260 La. 542, 256 So.2d 620, 623 (1972)(Duties "are designed to protect *some* persons under *some* circumstances against *some* risks.") The concept is sometimes referred to as "legal cause," "scope of the risk," or other terms. *See Pitre v. Opelousas General Hospital*, 530 So.2d 1151 (La.1988). The task of determining whether a plaintiff was within the scope of the duty is "one that must be undertaken by the court in each case as it arises." *Hill, supra. See also Shipley v. Shipley*, 709 So.2d 901, 903 (La.App. 2d Cir.1998)("The existence and scope of a duty depends on a case-by-case analysis of the standard of care required of each defendant under the particular circumstances.")

■ When addressing duties · or their scope the court should consider various policies or factors that a legislature might consider, such as whether the imposition of a duty would result in an unmanageable flow of litigation; ease of association be-

tween the plaintiff's harm and a defendant's conduct; economic, social and moral implications on similarly situated parties; the nature of defendant's activity; likelihood and gravity of the harm that may result from breach of the duty; the burden of prevention; and the direction in which society and its institutions are evolving. Precedent is also considered. *Roberts; Pitre; Meany v. Meany*, 639 So.2d 229, 233 (La.1994); *Caldwell v. Let The Good Times Roll Festival*, 717 So.2d 1263, 1272 (La.App. 2d Cir.1998); *Buras v. Petroleum Helicopters, Inc.*, 705 So.2d 766, 770 (La. App. 4th Cir.1997), *writ denied*, 715 So.2d 1213(La.), *cert. denied*, —— U.S. ——, 119 S.Ct. 72, 142 L.Ed.2d 56 (1998). The articulation of these many relevant factors demonstrates that these issues of law are heavily dependent upon a thorough knowledge of the relevant facts.

One of the most common scenarios in which a person is found to be negligent is when he knows or should have known that his behavior has created an unreasonable risk and it is reasonably foreseeable that the risk would damage another, yet he does not alter his behavior to avoid the harm. In this case there is evidence that GM knew that there was a high frequency of driver injury related to use of the four-point ratchet system that it required haulers to use. *See* Minutes of Directors of Maintenance ("The four-point system does not control torque, is not automated, has a high driver injury frequency, and is very labour-intensive."); Minutes of 10–24–91 meeting of GM Haulaway Directors of Maintenance Committee (Dale Warnick, presented findings of an investigation into the causes of worker's compensation claims. Of three major points made, "[f]inally, and most important, is that tying-down and loosening chains are related to 39.5 % of the injuries. Drivers typically exert forces of 100–280 lbs. on the tie-down bar.") The minutes also report that: "As the current tie-down methods not only require drivers to exert high levels of force, but also in precarious positions, it is

strongly suggested that improvements/changes to the tie-down process be considered." A report presented at a June 17, 1993 meeting showed that 28% of driver injuries were caused during the tie-down process. Memorandum in Opposition, Exhibits 12–14. A GM representative on the committees, Thomas Savich, Sr., testified that the only discussion of safety-type issues arose in approximately in 1991 or 1992 when some worker's compensation studies were briefly discussed at several meetings.

The court finds that the presence of these facts counsel that GM's motion be denied. Plaintiff has presented at least some specific evidence that GM had knowledge of a high rate of injury to drivers caused by the necessity that drivers employ a great deal of force to tie down with the current ratchet system. The alternative devices that GM rejected could have reduced the amount of force required by the drivers through the use of hydraulics or other mechanical advantage. There is evidence that GM rejected those alternatives for that very reason, apparently based on a concern that the drivers assisted by the mechanical advantage would damage the automobiles. It may be that these concerns or other factors, if they are supported by the evidence, will result in a determination that the scope of protection afforded by GM's duty did not reach the injury suffered by this Plaintiff. Perhaps that will not be the case. Until the facts are further developed, the court cannot determine the fact-intensive duty and scope issues.

Accordingly, GM's Motion for Summary Judgment (Doc. 64) is **GRANTED IN PART** by dismissing Plaintiff's claim for punitive damages against GM and **DENIED** in all other respects.